## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| APSEC Resolution Trust LLC, as assignee of Bank of Hope | |
| Plaintiff, | Case No. ___23-cv-2032_____ |
| v. | Honorable _____ |
| Jin Hwi Lee and Tony Cole | Property: 1205 N. Milwaukee Avenue Chicago, IL 60642 |
| Defendant(s). | |

## COMPLAINT TO FORECLOSE MORTGAGE
## AND FOR OTHER RELIEF

**NOW COMES** APSEC Resolution Trust LLC (herein, "Plaintiff"), by and through its attorneys, Ashen Law Group, and for its Complaint against Jin Hwi Lee and Tony Cole, and states as follows:

1.    Plaintiff is a Delaware limited liability company which members are citizens of the state of California.

2.    This Court has original subject matter jurisdiction in the above-captioned case pursuant to 28 U.S.C. 1332(a) because the matter in controversy is between citizens of different states and the damages claimed exceed the sum of $75,000.00, exclusive of interests and costs.

3.    This Court has personal jurisdiction over each Defendant pursuant to 735 ILCS 5/2-209(a) and (b).

4.    Venue is proper in this district pursuant to 28 U.S.C. 1391(b).

5.    Jin Hwi Lee ("Borrower") is a citizen of the state of Illinois and was at all times referenced in this complaint a resident of the state of Illinois.

6.      Tony Cole ("Tenant") is a citizen of the state of Illinois and was at all times relevant a resident of the state of Illinois.

## FACTS COMMON TO ALL COUNTS

7.      On or about December 30, 2011, Borrower executed a Promissory Note Loan Number 120800000003 in the amount of $286,580.00 (the "Note") in favor of Plaintiff's predecessor, Foster Bank. A true and correct copy of the Note is attached hereto as **Exhibit A**.

8.      On or about December 30, 2011, to induce Foster Bank to enter into the Note, Borrower executed a mortgage between Borrower and in favor of Foster Bank (the "Mortgage"), on the income producing property commonly known as 1205 N. Milwaukee Avenue, Chicago, Illinois 60642 (the "Property"). A true and correct copy of the recorded Mortgage dated December 30, 2011 is attached hereto as **Exhibit B**.

9.      On August 13, 2013, the Comptroller of Currency of the State of California certified the merger of Foster Bank and BBCN Bank. On or about July 29, 2016, an Agreement of Bank Merger was executed, whereby BBCN Bank and Wilshire Bank merged to create Bank of Hope. True and correct copies of the bank succession documents are attached hereto as **Exhibit C**.

10.     Thereafter, on or about December 12, 2016, as further consideration and security for the Note, Borrower executed that certain Change in Terms Agreement, and that certain Business Loan Agreement. A true and correct copy of the Change in Terms Agreement is attached hereto as **Exhibit D**.  A true and correct copy of the Business Loan Agreement is attached hereto as **Exhibit E**.

11.     On or about December 12, 2016, as further consideration and security for Note, Borrower executed a Modification of Mortgage. The Modification of Mortgage was recorded with

the Cook County Recorder of Deeds on January 4, 2017, as Document No. 1700410046. A true and correct copy of the recorded Modification of Mortgage is attached hereto as **Exhibit F**.

12.     As further consideration and security for Note, Borrower executed an Assignment of Rents for the Property recorded January 4, 2017, as Document No. 1700410047. A true and correct copy of the recorded Assignment of Rents is attached hereto as **Exhibit G**.

13.     The Note, Mortgage, Change in Terms Agreement, Business Loan Agreement, Modification of Mortgage, and Assignment of Rents, shall collectively herein be referred to as the "Loan Documents".

14.     On or about December 29, 2022, Bank of Hope assigned to Plaintiff its right, title and interest in the Loan Documents to Plaintiff. A true and correct copy of the recorded Assignment of Mortgage as recorded with the Cook County Clerk on January 4, 2023 as Document No. 2300422002 is attached hereto as **Exhibit H**. A true and correct copy of the Assignment of Assignment of Rents as recorded with the Cook County Clerk on January 4, 2023 as Document No. 2300422003 is attached hereto as **Exhibit I**.

## COUNT I: MORTGAGE FORECLOSURE

15.     Plaintiff files this Count to foreclose the Mortgage that it holds on the Property and joins Jin Hwi Lee and Tony Cole as Defendants.

16.     Plaintiff re-alleges and restates paragraphs 1-10 as if stated herein.

| | | |
|---|---|---|
| a. | Nature of instrument: | Mortgage |
| b. | Date of Mortgage: | December 30, 2011 |
| c. | Name of mortgagor(s): | Jin Hwi Lee |
| d. | Name of mortgagee: | APSEC Resolution Trust LLC |
| e. | Date, place, and Identification of recording | The Mortgage was recorded with the Cook County Recorder of Deeds on January 13, |

2012, as Document No. 1201331093.

A Modification of Mortgage was recorded with the Cook County Recorder of Deeds January 4, 2017 as Document No. 1700410046.

An Assignment of Mortgage was recorded with the Cook County Clerk on January 4, 2023 as Document No. Document No. 2300422002

| | | |
|---|---|---|
| f. | Identification of recording | Document No. 1201331093 (Mortgage)<br>Document No. 1700410046 (Modification)<br>Document No. 2300422002 (Assignment) |
| g. | Interest subject to mortgage | 100% fee simple |
| h. | Amount of original indebtedness, including subsequent advances made under Mortgage: | $286,580.00. |
| i. | Both the legal description of mortgaged real estate and the common address or other information sufficient to identify it with reasonable certainty | LOT 71 IN SUBDIVISION OF BLOCK 12 IN CANAL TRUSTEE'S SUBDIVISION OF THE WEST PART OF SECTION 5, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN (EXCEPT THE SOUTH EAST 1/4 OF THE NORTHWEST 1/4 AND THE NORTHEAST 1/4 OF THE SOUTHWEST 1/4) IN COOK COUNTY, ILLINOIS. |
| j. | Statements as to default: | • Failure to provide financial reports and additional documents pursuant to ¶ 21 of the Mortgage and Business Loan Agreement. |
| k. | Statement as to unpaid principal, interest, other charges and total accelerated amount as of March 27, 2023 | Principal            $98,228.35<br>Interest:           $71.62336.98<br>*Per diem interest at $24.5571<br><br>**Total**            $98,565.33 |

| | | |
|---|---|---|
| l. | Name of present owner of the real estate: | Jin Hwi Lee |
| m. | Names of defendants claimed to be personally liable for deficiency, if any: | Jin Hwi Lee |
| n. | Names of other persons who are joined as defendants and whose interest in or lien on the mortgaged real estate is sought to be terminated | Tony Cole is the current occupant of the Property. |
| o. | Capacity in which plaintiff brings this foreclosure | Plaintiff is the legal holder of the Mortgage. |
| p. | Facts in support of request for attorneys' fees and of costs and expenses: | Pursuant to ¶ 16 of the Mortgage, Plaintiff shall be entitled to collect all expenses incurred in pursuing the remedies provided in the Mortgage, including all reasonable attorneys' fees and costs, and other legal expenses. |
| q. | The names of defendants whose rights to possess the mortgaged real estate after the confirmation of a foreclosure sale is sought to be terminated: | Jin Hwi Lee, Tony Cole |
| r. | Facts in Support of a shortened or waived redemption: | The right of redemption was waived in ¶ 25 of the Mortgage. |
| s. | Facts in Support of a shortened reinstatement period; or that the right of reinstatement was waived: | The right of reinstatement was waived in ¶ 25 of the Mortgage. |
| t. | Facts in support of a request for appointment of mortgagee in possession or appointment of a receiver: | Plaintiff reserves its right pursuant to the Mortgage to be placed as a mortgagee in possession or have a receiver appointed later. |

## COUNT II: BREACH OF NOTE

17.     Plaintiff re-alleges and re-states paragraphs 1 through 16 as though set forth fully herein.

18.     On December 30, 2011, Borrower executed the Note in favor of Foster Bank in the original amount of $286,580.00.

19.     Thereafter, on or about December 12, 2016, as further consideration and security for the Note, Borrower executed that certain Business Loan Agreement, to which the Note remains subject to. See Ex. E; p. 1.

20.     Plaintiff is the holder and owner of the Note. Plaintiff has performed all the obligations on its part to be performed under the Note.

21.     Borrower is in breach of the Note and Business Loan Agreement, having breached the affirmative covenant which requires Borrower to "maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit [Plaintiff] to examine and audit Borrower's books and records at all reasonable times". *Id.*; p. 2.

22.     Furthermore, Borrower is in breach of the Note for failure to pay real estate taxes due and owing as of December 30, 2022. *Id*.

23.     There is due from the Borrower, as of March 27, 2023, in the amount of $98,565.33 which includes unpaid principal, interest, late fees and costs.

24.     Interest continues to accrue after March 27, 2023, at the rate of $24.5571 per day.

25.     Plaintiff has demanded that Borrower fulfill their obligations under the Note; however, Borrower has refused, and continues to refuse, to fulfill their obligations under the Note.

26.     The Note states that Borrower shall pay all court costs and attorneys' fees in the event of a default under the Note to Plaintiff in collecting the sums owed.

**WHEREFORE**, Plaintiff, APSEC Resolution Trust LLC, requests from this Court (i) a judgment to foreclose and sale, (ii) a personal judgment for a deficiency (iii) an order granting possession, if sought, (iv) a judgment for attorneys' fees, costs, and expenses, (v) an order granting or waiving the redemption period, (vi) an order placing the Mortgagee in possession or appointing a receiver, if sought, (vii) such other relief as this court may deem just and equitable.

Respectfully submitted,

Ashen Law Group
217 N. Jefferson Street, Suite 601
Chicago, IL 60661
(312) 655-0800
ARDC: 6335936
bgipson@ashenlaw.com

By:  /s/ Brian Gipson
**Brian Gipson, Esq.**
Attorney for Plaintiff APSEC
Resolution Trust LLC

# <u>Exhibit A</u>

| | | |
|---|---|---|
| Jin Hwi Lee<br>175 E. Delaware Pl. #5805<br>Chicago, IL 60611 | Foster Bank<br>5005 NEWPORT DRIVE<br>ROLLING MEADOWS, IL 60008 | Loan Number 120800000003<br>Date 12-30-2011<br>Maturity Date 01-01-2017<br>Loan Amount $ 286,580.00<br>Renewal Of |
| **BORROWER'S NAME AND ADDRESS**<br>"I" includes each borrower above, jointly and severally. | **LENDER'S NAME AND ADDRESS**<br>"You" means the lender, its successors and assigns. | |

For value received, I promise to pay to you, or your order, at your address listed above the **PRINCIPAL** sum of   two hundred eighty six thousand five hundred
eighty and no/100 _____ Dollars $ 286,580.00

[X]   **Single Advance:** I will receive all of this principal sum on _____ 12-30-2011 _____ . No additional advances are contemplated under this note.

[ ]   **Multiple Advance:** The principal sum shown above is the maximum amount of principal I can borrow under this note. On _____
_____ I will receive the amount of $ _____ and future principal advances are contemplated.
   **Conditions:** The conditions for future advances are _____
   _____

   [ ]   **Open End Credit:** You and I agree that I may borrow up to the maximum amount of principal more than one time. This feature is subject to
        all other conditions and expires on _____ .
   [ ]   **Closed End Credit:** You and I agree that I may borrow up to the maximum only one time (and subject to all other conditions).

**INTEREST:** I agree to pay interest on the outstanding principal balance from _____ 12-30-2011 _____ at the rate of ___ 6.750 %
   per year until 01-01-2017 _____ .

[ ]   **Variable Rate:** This rate may then change as stated below.
   [ ]   **Index Rate:** The future rate will be _____ the following index rate: _____
        _____ .

   [ ]   **No Index:** The future rate will not be subject to any internal or external index. It will be entirely in your control.
   [ ]   **Frequency and Timing:** The rate on this note may change as often as _____
        A change in the interest rate will take effect _____ .
   [ ]   **Limitations:** During the term of this loan, the applicable annual interest rate will not be more than _____ % or less than
        _____ %. The rate may not change more than _____ % each _____ .
   **Effect of Variable Rate:** A change in the interest rate will have the following effect on the payments:
   [ ] The amount of each scheduled payment will change.       [ ] The amount of the final payment will change.
   [ ] _____

**ACCRUAL METHOD:** Interest will be calculated on a _____ Actual/360 _____ basis.

**POST MATURITY RATE:** I agree to pay interest on the unpaid balance of this note owing after maturity, and until paid in full, as stated below:
   [X]   on the same fixed or variable rate basis in effect before maturity (as indicated above).
   [ ]   at a rate equal to _____

[X]   **LATE CHARGE:** If a payment is made more than ___ 15 ___ days after it is due, I agree to pay a late charge of 5.000% of the late amount with a
        min of $25.00

[ ]   **RETURN CHECK CHARGE.** I agree to pay the greater of $ _____ or all costs and expenses incurred in connection with any payment
        on this loan that is returned because it has been dishonored.

[ ]   **ADDITIONAL CHARGES:** In addition to interest, I agree to pay the following charges which [ ] are [ ] are not included in the principal amount
        above: _____ .

**PAYMENTS:** I agree to pay this note as follows:

59 monthly payments of $2,535.97 beginning 02-01-2012 and 1 balloon payment of $224,924.70 on 01-01-2017.

Prepayment Penalties: If the Lender receives a prepayment on or before the 1st anniversary of the date of the first payment due date of the Note, the Penalty shall be equal to 5% of
the remaining Principal balance of the Note. If the Lender receives a prepayment after the 1st anniversary but on or before the 2nd anniversary of the date of the first payment due
date of the Note, the Penalty shall be equal to 4% of the remaining Principal balance of the Note. If the Lender receives a prepayment after the 2nd anniversary but on or before the
3rd anniversary of the date of the first payment due date of the Note, the Penalty shall be equalto 3% of the remaining Principal balance of the Note. If the Lender receives a
prepayment after the 3rd anniversary but on or before the 4th anniversary of the date of the first payment due date of the Note, the Penalty shall be equal to 2% of the remaining
Principal balance of the Note. If the Lender receives a prepayment after the 4th anniversary of the date of the first payment due date of the Note, but before the due date of the Note,
the Penalty shall be equal to 1% of the remaining Principal balance of the Note.


**ADDITIONAL TERMS:**

First mortgage and an assignment of rents against the commercial property located at 1205 North Milwaukee Avenue, Chicago, IL 60622

| | |
|---|---|
| [ ]   **SECURITY:** This note is separately secured by (describe separate document by type and date):<br><br>(This section is for your internal use. Failure to list a separate security document does not mean the agreement will not secure this note.) | **PURPOSE:** The purpose of this loan is refinancing existing loan#1208000-1<br><br>[ ]   **CONFESSION OF JUDGMENT:** I agree to the terms of the "Confession of Judgment" paragraph on page 2.<br>**SIGNATURES: I AGREE TO THE TERMS OF THIS NOTE (INCLUDING THOSE ON PAGE 2),** I have received a copy of today's date. |
| Signature for Lender<br><br>_____<br>Dong Hoon Kim | Jin Hwi Lee<br><br>Witness by:<br>~~MAIN H Mart~~<br>Name: Min Jw Date: 12/30/11 |

UNIVERSAL NOTE
Experl © 1984, 1991 Bankers Systems, Inc., St. Cloud, MN Form UN-IL 3/6/2002

Scanned and Verified by: BBCN/JK05706 on 3/12/2014

**DEFINITIONS:** As used on page 1, "☒" means the terms that apply to this loan. "I," "me" or "my" means each Borrower who signs this note and each other person or legal entity (including guarantors, endorsers, and sureties) who agrees to pay this note (together referred to as "us"). "You" or "your" means the Lender and its successors and assigns.

**APPLICABLE LAW:** The law of the state of Illinois will govern this note. Any term of this note which is contrary to applicable law will not be effective, unless the law permits you and me to agree to such a variation. If any provision of this agreement cannot be enforced according to its terms, this fact will not affect the enforceability of the remainder of this agreement. No modification of this agreement may be made without your express written consent. Time is of the essence in this agreement.

**COMMISSIONS OR OTHER REMUNERATION:** I understand and agree that any insurance premiums paid to insurance companies as part of this note will involve money retained by you or paid back to you as commissions or other remuneration.

In addition, I understand and agree that some other payments to third parties as part of this note may also involve money retained by you or paid back to you as commissions or other remuneration.

**PAYMENTS:** Each payment I make on this note will first reduce the amount I owe you for charges which are neither interest nor principal. The remainder of each payment will then reduce accrued unpaid interest, and then unpaid principal. If you and I agree to a different application of payments, we will describe our agreement on this note. I may prepay a part of, or the entire balance of this loan without penalty, unless we specify to the contrary on this note. Any partial prepayment will not excuse or reduce any later scheduled payment until this note is paid in full (unless, when I make the prepayment, you and I agree in writing to the contrary).

**INTEREST:** Interest accrues on the principal remaining unpaid from time to time, until paid in full. If I receive the principal in more than one advance, each advance will start to earn interest only when I receive the advance. The interest rate in effect on this note at any given time will apply to the entire principal advanced at that time. Notwithstanding anything to the contrary, I do not agree to pay and you do not intend to charge any rate of interest that is higher than the maximum rate of interest you could charge under applicable law for the extension of credit that is agreed to here (either before or after maturity). If any notice of interest accrual is sent and is in error, we mutually agree to correct it, and if you actually collect more interest than allowed by law and this agreement, you agree to refund it to me.

**INDEX RATE:** The index will serve only as a device for setting the rate on this note. You do not guarantee by selecting this index, or the margin, that the rate on this note will be the same rate you charge on any other loans or class of loans to me or other borrowers.

**ACCRUAL METHOD:** The amount of interest that I will pay on this loan will be calculated using the interest rate and accrual method stated on page 1 of this note. For the purpose of interest calculation, the accrual method will determine the number of days in a "year." If no accrual method is stated, then you may use any reasonable accrual method for calculating interest.

**POST MATURITY RATE:** For purposes of deciding when the "Post Maturity Rate" (shown on page 1) applies, the term "maturity" means the date of the last scheduled payment indicated on page 1 of this note or the date you accelerate payment on the note, whichever is earlier.

**SINGLE ADVANCE LOANS:** If this is a single advance loan, you and I expect that you will make only one advance of principal. However, you may add other amounts to the principal if you make any payments described in the "PAYMENTS BY LENDER" paragraph below.

**MULTIPLE ADVANCE LOANS:** If this is a multiple advance loan, you and I expect that you will make more than one advance of principal. If this is closed end credit, repaying a part of the principal will not entitle me to additional credit.

**PAYMENTS BY LENDER:** If you are authorized to pay, on my behalf, charges I am obligated to pay (such as property insurance premiums), then you may treat those payments made by you as advances and add them to the unpaid principal under this note, or you may demand immediate payment of the charges.

**SET-OFF:** I agree that you may set off any amount due and payable under this note against any right I have to receive money from you.

"Right to receive money from you" means:
(1) any deposit account balance I have with you;
(2) any money owed to me on an item presented to you or in your possession for collection or exchange; and
(3) any repurchase agreement or other nondeposit obligation.

"Any amount due and payable under this note" means the total amount of which you are entitled to demand payment under the terms of this note at the time you set off. This total includes any balance the due date for which you properly accelerate under this note.

If my right to receive money from you is also owned by someone who has not agreed to pay this note, your right of set-off will apply to my interest in the obligation and to any other amounts I could withdraw on my sole request or endorsement. Your right of set-off does not apply to an account or other obligation where my rights are only as a representative. It also does not apply to any Individual Retirement Account or other tax-deferred retirement account.

You will not be liable for the dishonor of any check when the dishonor occurs because you set off this debt against any of my accounts. I agree to hold you harmless from any such claims arising as a result of your exercise of your right of set-off.

**REAL ESTATE OR RESIDENCE SECURITY:** If this note is secured by real estate or a residence that is personal property, the existence of a default and your remedies for such a default will be determined by applicable law, by the terms of any separate instrument creating the security interest and, to the extent not prohibited by law and not contrary to the terms of the separate security instrument, by the "Default" and "Remedies" paragraphs herein.

**DEFAULT:** I will be in default if any one or more of the following occur: (1) I fail to make a payment on time or in the amount due; (2) I fail to keep the property insured, if required; (3) I fail to pay, or keep any promise, on any debt or agreement I have with you; (4) any other creditor of mine attempts to collect any debt I owe him through court proceedings; (5) I die, am declared incompetent, make an assignment for the benefit of creditors, or become insolvent (either because my liabilities exceed my assets or I am unable to pay my debts as they become due); (6) I make any written statement or provide any financial information that is untrue or inaccurate at the time it was provided; (7) I do or fail to do something which causes you to believe that you will have difficulty collecting the amount I owe you; (8) any collateral securing this note is used in a manner or for a purpose which threatens confiscation by a legal authority; (9) I change my name or assume an additional name without first notifying you before making such a change; (10) I fail to plant, cultivate and harvest crops in due season if I am a producer of crops; (11) any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity, as further explained in 7 C.F.R. Part 1940, Subpart G, Exhibit M.

**REMEDIES:** If I am in default on this note you have, but are not limited to, the following remedies:
(1) You may demand immediate payment of all I owe you under this note (principal, accrued unpaid interest and other accrued charges).
(2) You may set off this debt against any right I have to the payment of money from you, subject to the terms of the "Set-Off" paragraph herein.
(3) You may demand security, additional security, or additional parties to be obligated to pay this note as a condition for not using any other remedy.
(4) You may refuse to make advances to me or allow purchases on credit by me.
(5) You may use any remedy you have under state or federal law.

By selecting any one or more of these remedies you do not give up your right to later use any other remedy. By waiving your right to declare an event to be a default, you do not waive your right to later consider the event as a default if it continues or happens again.

**CONFESSION OF JUDGMENT:** If agreed on page 1, then, in addition to your remedies listed herein, I authorize any attorney to appear in any court of record having jurisdiction over this matter and to confess judgment, without process, against me, in favor of you, for any unpaid principal, accrued interest and accrued charges due on this agreement, together with collection costs including reasonable attorney's fees.

**COLLECTION COSTS AND ATTORNEY'S FEES:** I agree to pay all costs of collection, replevin or any other or similar type of cost if I am in default. In addition, if you hire an attorney to collect this note, I also agree to pay any fee you incur with such attorney plus court costs (except where prohibited by law). To the extent permitted by the United States Bankruptcy Code, I also agree to pay the reasonable attorney's fees and costs you incur to collect this debt as awarded by any court exercising jurisdiction under the Bankruptcy Code.

**WAIVER:** I give up my rights to require you to do certain things. I will not require you to:
(1) demand payment of amounts due (presentment);
(2) obtain official certification of nonpayment (protest); or
(3) give notice that amounts due have not been paid (notice of dishonor).

I waive any defenses I have based on suretyship or impairment of collateral.

**OBLIGATIONS INDEPENDENT:** I understand that I must pay this note even if someone else has also agreed to pay it (by, for example, signing this form or a separate guarantee or endorsement). You may sue me alone, or anyone else who is obligated on this note, or any number of us together, to collect this note. You may do so without any notice that it has not been paid (notice of dishonor). You may without notice release any party to this agreement without releasing any other party. If you give up any of your rights, with or without notice, it will not affect my duty to pay this note. Any extension of new credit to any of us, or renewal of this note by all or less than all of us will not release me from my duty to pay it. (Of course, you are entitled to only one payment in full.) I agree that you may at your option extend this note or the debt represented by this note, or any portion of the note or debt, from time to time without limit or notice and for any term without affecting my liability for payment of the note. I will not assign my obligation under this agreement without your prior written approval.

**FINANCIAL INFORMATION:** I agree to provide you, upon request, any financial statement or information you may deem necessary. I warrant that the financial statements and information I provide to you are or will be accurate, correct and complete.

**NOTICE:** Unless otherwise required by law, any notice to me shall be given by delivering it or by mailing it by first class mail addressed to me at my last known address. My current address is on page 1. I agree to inform you in writing of any change in my address. I will give any notice to you by mailing it first class to your address stated on page 1 of this agreement, or to any other address that you have designated.

| DATE OF TRANSACTION | PRINCIPAL ADVANCE | BORROWER'S INITIALS (not required) | PRINCIPAL PAYMENTS | PRINCIPAL BALANCE | INTEREST RATE | INTEREST PAYMENTS | INTEREST PAID THROUGH: |
|---|---|---|---|---|---|---|---|
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |

Expere™ ©1984, 1991 Bankers Systems, Inc., St. Cloud, MN Form UN-IL 3/6/2002

Scanned and Verified by: BBCN\JK05706 on 3/12/2014

# Exhibit B

# Illinois Anti-Predatory Lending Database Program

## Certificate of Exemption



Doc#: 1201331093 Fee: $58.00
Eugene "Gene" Moore RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 01/13/2012 12:25 PM Pg: 1 of 12

**Report Mortgage Fraud**
**800-532-8785**

---

The property identified as:     **PIN:** 17-05-115-085-0000

**Address:**
**Street:**      1205 North Milwaukee Avenue
**Street line 2:**
**City:** Chicago          **State:** IL          **ZIP Code:** 60622

**Lender:** Foster Bank

**Borrower:** Jin Hwi Lee

**Loan / Mortgage Amount:** $286,580.00

This property is located within the program area and is exempt from the requirements of 765 ILCS 77/70 et seq. because it is commercial property.

**Certificate number:** 5948A9FB-C72F-4C4E-A7E2-0706C2F5A1FA          **Execution date:** 12/22/2011

This instrument was prepared by:
Foster Bank/Soo Jin Kang
5005 NEWPORT DRIVE
ROLLING MEADOWS, IL  60008

When recorded return to (name, address):
Foster Bank/Loan#1208000 00003
5005 NEWPORT DRIVE
ROLLING MEADOWS, IL  60008

—————— State of Illinois —————————— Space Above This Line For Recording Data ——————

# REAL ESTATE MORTGAGE
### (With Future Advance Clause)

1. **DATE AND PARTIES.** The date of this Mortgage (Security Instrument) is _____ 12-30-2011 _____ and the parties, their addresses and tax identification numbers, if required, are as follows:

   MORTGAGOR:   Jin Hwi Lee
   175 E. Delaware Pl. #5805
   Chicago, IL  60611

   ☐ If checked, refer to the attached Addendum incorporated herein, for additional Mortgagors, their signatures and acknowledgments.

   LENDER:   Foster Bank
   Organized and existing under the laws of the state of Illinois
   5005 NEWPORT DRIVE
   ROLLING MEADOWS, IL  60008

2. **CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debt (defined below) and Mortgagor's performance under this Security Instrument, Mortgagor grants, bargains, sells, conveys, mortgages and warrants to Lender the following described property:
   See Attached legal description as "Exhibit A"

   The property is located in Cook _____ at  1205 North Milwaukee _____
   _____(County)_

   Avenue _____ ,  Chicago _____ ,  Illinois  60622 _____
   _____(Address)_____(City)_____(Zip Code)_

   Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, crops, timber, all diversion payments or third party payments made to crop producers, all water and riparian rights, wells, ditches, reservoirs, and water stock and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described above (all referred to as "Property").

3. **SECURED DEBT AND FUTURE ADVANCES.** The term "Secured Debt" is defined as follows:
   A. Debt incurred under the terms of all promissory note(s), contract(s), guaranty(ies) or other evidence of debt described below and all their extensions, renewals, modifications or substitutions. *(When referencing the debts below it is suggested that you include items such as borrowers' names, note amounts, interest rates, maturity dates, etc.)*
   See Attached "Exhibit B" a copy of the promissory Note which secured by this Mortgage

ILLINOIS - AGRICULTURAL/COMMERCIAL REAL ESTATE SECURITY INSTRUMENT (NOT FOR FNMA, FHLMC, FHA OR VA USE, AND NOT FOR CONSUMER PURPOSES)     *(page 1 of 8)*

Exper̃e̤™  ©1993, 2001 Bankers Systems, Inc., St. Cloud, MN  Form AGCO-RESI-IL  12/27/2002

B. All future advances from Lender to Mortgagor or other future obligations of Mortgagor to Lender under any promissory note, contract, guaranty, or other evidence of debt existing now or executed after this Security Instrument whether or not this Security Instrument is specifically referenced. If more than one person signs this Security Instrument, each Mortgagor agrees that this Security Instrument will secure all future advances and future obligations that are given to or incurred by any one or more Mortgagor, or any one or more Mortgagor and others. All future advances and other future obligations are secured by this Security Instrument even though all or part may not yet be advanced. All future advances and other future obligations are secured as if made on the date of this Security Instrument. Nothing in this Security Instrument shall constitute a commitment to make additional or future loans or advances in any amount. Any such commitment must be agreed to in a separate writing.

C. All obligations Mortgagor owes to Lender, which now exist or may later arise, to the extent not prohibited by law, including, but not limited to, liabilities for overdrafts relating to any deposit account agreement between Mortgagor and Lender.

D. All additional sums advanced and expenses incurred by Lender for insuring, preserving or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

This Security Instrument will not secure any other debt if Lender fails to give any required notice of the right of rescission.

4. **PAYMENTS.** Mortgagor agrees that all payments under the Secured Debt will be paid when due and in accordance with the terms of the Secured Debt and this Security Instrument.

5. **PRIOR SECURITY INTERESTS.** With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Mortgagor agrees:
   A. To make all payments when due and to perform or comply with all covenants.

   B. To promptly deliver to Lender any notices that Mortgagor receives from the holder.

   C. Not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written consent.

6. **CLAIMS AGAINST TITLE.** Mortgagor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Mortgagor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Mortgagor's payment. Mortgagor will defend title to the Property against any claims that would impair the lien of this Security Instrument. Mortgagor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses Mortgagor may have against parties who supply labor or materials to maintain or improve the Property.

7. **DUE ON SALE OR ENCUMBRANCE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, any lien, encumbrance, transfer or sale of the Property. This right is subject to the restrictions imposed by federal law (12 C.F.R. 591), as applicable. This covenant shall run with the Property and shall remain in effect until the Secured Debt is paid in full and this Security Instrument is released.

8. **TRANSFER OF AN INTEREST IN THE MORTGAGOR.** If Mortgagor is an entity other than a natural person (such as a corporation or other organization), Lender may demand immediate payment if:
   A. A beneficial interest in Mortgagor is sold or transferred.

   B. There is a change in either the identity or number of members of a partnership or similar entity.

   C. There is a change in ownership of more than 25 percent of the voting stock of a corporation or similar entity.

However, Lender may not demand payment in the above situations if it is prohibited by law as of the date of this Security Instrument.

9. **ENTITY WARRANTIES AND REPRESENTATIONS.** If Mortgagor is an entity other than a natural person (such as a corporation or other organization), Mortgagor makes to Lender the following warranties and representations which shall continue as long as the Secured Debt remains outstanding:

   A. Mortgagor is duly organized and validly existing in Mortgagor's state of incorporation or organization. Mortgagor is in good standing in all states in which Mortgagor transacts business. Mortgagor has the power and authority to own the Property and to carry on its business as now being conducted and, as applicable, is qualified to do so in each state in which Mortgagor operates.

   B. The execution, delivery and performance of this Security Instrument by Mortgagor and the obligations evidenced by the Secured Debt are within the power of Mortgagor, have been duly authorized, have received all

*(page 2 of 8)*

necessary governmental approval, and will not violate any provision of law, or order of court or governmental agency.

C. Other than previously disclosed in writing to Lender, Mortgagor has not changed its name within the last ten years and has not used any other trade or fictitious name. Without Lender's prior written consent, Mortgagor does not and will not use any other name and will preserve its existing name, trade names and franchises until the Secured Debt is satisfied.

10. **PROPERTY CONDITION, ALTERATIONS AND INSPECTION.** Mortgagor will keep the Property in good condition and make all repairs that are reasonably necessary. Mortgagor shall not commit or allow any waste, impairment, or deterioration of the Property. Mortgagor will keep the Property free of noxious weeds and grasses. Mortgagor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent. Mortgagor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent. Mortgagor will notify Lender of all demands, proceedings, claims, and actions against Mortgagor, and of any loss or damage to the Property.

No portion of the Property will be removed, demolished or materially altered without Lender's prior written consent except that Mortgagor has the right to remove items of personal property comprising a part of the Property that become worn or obsolete, provided that such personal property is replaced with other personal property at least equal in value to the replaced personal property, free from any title retention device, security agreement or other encumbrance. Such replacement of personal property will be deemed subject to the security interest created by this Security Instrument. Mortgagor shall not partition or subdivide the Property without Lender's prior written consent.

Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property. Lender shall give Mortgagor notice at the time of or before an inspection specifying a reasonable purpose for the inspection. Any inspection of the Property shall be entirely for Lender's benefit and Mortgagor will in no way rely on Lender's inspection.

11. **AUTHORITY TO PERFORM.** If Mortgagor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed. Mortgagor appoints Lender as attorney in fact to sign Mortgagor's name or pay any amount necessary for performance. Lender's right to perform for Mortgagor shall not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Security Instrument. If any construction on the Property is discontinued or not carried on in a reasonable manner, Lender may take all steps necessary to protect Lender's security interest in the Property, including completion of the construction.

12. **ASSIGNMENT OF LEASES AND RENTS.** Mortgagor assigns, grants, bargains, conveys, mortgages and warrants to Lender as additional security all the right, title and interest in the following (Property).
   A. Existing or future leases, subleases, licenses, guaranties and any other written or verbal agreements for the use and occupancy of the Property, including but not limited to, any extensions, renewals, modifications or replacements (Leases).
   B. Rents, issues and profits, including but not limited to, security deposits, minimum rents, percentage rents, additional rents, common area maintenance charges, parking charges, real estate taxes, other applicable taxes, insurance premium contributions, liquidated damages following default, cancellation premiums, "loss of rents" insurance, guest receipts, revenues, royalties, proceeds, bonuses, accounts, contract rights, general intangibles, and all rights and claims which Mortgagor may have that in any way pertain to or are on account of the use or occupancy of the whole or any part of the Property (Rents).
In the event any item listed as Leases or Rents is determined to be personal property, this Assignment will also be regarded as a security agreement.

Mortgagor will promptly provide Lender with copies of the Leases and will certify these Leases are true and correct copies. The existing Leases will be provided on execution of the Assignment, and all future Leases and any other information with respect to these Leases will be provided immediately after they are executed. Mortgagor may collect, receive, enjoy and use the Rents so long as Mortgagor is not in default. Mortgagor will not collect in advance any Rents due in future lease periods, unless Mortgagor first obtains Lender's written consent. Upon default, Mortgagor will receive any Rents in trust for Lender and Mortgagor will not commingle the Rents with any other funds. When Lender so directs, Mortgagor will endorse and deliver any payments of Rents from the Property to Lender. Amounts collected will be applied at Lender's discretion to the Secured Debts, the costs of managing, protecting and preserving the Property, and other necessary expenses. Mortgagor agrees that this Security Instrument is immediately effective between Mortgagor and Lender and effective as to third parties on the recording of this Assignment.

As long as this Assignment is in effect, Mortgagor warrants and represents that no default exists under the Leases, and the parties subject to the Leases have not violated any applicable law on leases, licenses and landlords and tenants. Mortgagor, at its sole cost and expense, will keep, observe and perform, and require all other parties to the Leases to comply with the Leases and any applicable law. If Mortgagor or any party to the Lease defaults or fails to observe any applicable law, Mortgagor will promptly notify Lender. If Mortgagor neglects or refuses to enforce compliance with the terms of the Leases, then Lender may, at Lender's option, enforce compliance.

Mortgagor will not sublet, modify, extend, cancel, or otherwise alter the Leases, or accept the surrender of the Property covered by the Leases (unless the Leases so require) without Lender's consent. Mortgagor will not assign,

Experé™ ©1993, 2001 Bankers Systems, Inc., St. Cloud, MN Form AGCO-RESI-IL 12/27/2002

compromise, subordinate or encumber the Leases and Rents without Lender's prior written consent. Lender does not assume or become liable for the Property's maintenance, depreciation, or other losses or damages when Lender acts to manage, protect or preserve the Property, except for losses and damages due to Lender's gross negligence or intentional torts. Otherwise, Mortgagor will indemnify Lender and hold Lender harmless for all liability, loss or damage that Lender may incur when Lender opts to exercise any of its remedies against any party obligated under the Leases.

13. **LEASEHOLDS; CONDOMINIUMS; PLANNED UNIT DEVELOPMENTS.** Mortgagor agrees to comply with the provisions of any lease if this Security Instrument is on a leasehold. If the Property includes a unit in a condominium or a planned unit development, Mortgagor will perform all of Mortgagor's duties under the covenants, by-laws, or regulations of the condominium or planned unit development.

14. **DEFAULT.** Mortgagor will be in default if any of the following occur:
   A. Any party obligated on the Secured Debt fails to make payment when due;

   B. A breach of any term or covenant in this Security Instrument or any other document executed for the purpose of creating, securing or guarantying the Secured Debt;

   C. The making or furnishing of any verbal or written representation, statement or warranty to Lender that is false or incorrect in any material respect by Mortgagor or any person or entity obligated on the Secured Debt;

   D. The death, dissolution, or insolvency of, appointment of a receiver for, or application of any debtor relief law to, Mortgagor or any other person or entity obligated on the Secured Debt;

   E. A good faith belief by Lender at any time that Lender is insecure with respect to any person or entity obligated on the Secured Debt or that the prospect of any payment is impaired or the value of the Property is impaired;

   F. A material adverse change in Mortgagor's business including ownership, management, and financial conditions, which Lender in its opinion believes impairs the value of the Property or repayment of the Secured Debt; or

   G. Any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity, as further explained in 7 C.F.R. Part 1940, Subpart G, Exhibit M.

15. **REMEDIES ON DEFAULT.** In some instances, federal and state law will require Lender to provide Mortgagor with notice of the right to cure or other notices and may establish time schedules for foreclosure actions. Subject to these limitations, if any, Lender may accelerate the Secured Debt and foreclose this Security Instrument in a manner provided by law if Mortgagor is in default. Upon default, Lender shall have the right, without declaring the whole indebtedness due and payable, to foreclose against all or part of the Property and shall have the right to possession provided by law. This Security Instrument shall continue as a lien on any part of the Property not sold on foreclosure.

   At the option of Lender, all or any part of the agreed fees and charges, accrued interest and principal shall become immediately due and payable, after giving notice if required by law, upon the occurrence of a default or anytime thereafter. In addition, Lender shall be entitled to all the remedies provided by law, the terms of the Secured Debt, this Security Instrument and any related documents. All remedies are distinct, cumulative and not exclusive, and the Lender is entitled to all remedies provided at law or equity, whether or not expressly set forth. The acceptance by Lender of any sum in payment or partial payment on the Secured Debt after the balance is due or is accelerated or after foreclosure proceedings are filed shall not constitute a waiver of Lender's right to require complete cure of any existing default. By not exercising any remedy on Mortgagor's default, Lender does not waive Lender's right to later consider the event a default if it continues or happens again.

16. **EXPENSES; ADVANCES ON COVENANTS; ATTORNEYS' FEES; COLLECTION COSTS.** Except when prohibited by law, Mortgagor agrees to pay all of Lender's expenses if Mortgagor breaches any covenant in this Security Instrument. Mortgagor will also pay on demand any amount incurred by Lender for insuring, inspecting, preserving or otherwise protecting the Property and Lender's security interest. These expenses will bear interest from the date of the payment until paid in full at the highest interest rate in effect as provided in the terms of the Secured Debt. Mortgagor agrees to pay all costs and expenses incurred by Lender in collecting, enforcing or protecting Lender's rights and remedies under this Security Instrument. This amount may include, but is not limited to, attorneys' fees, court costs, and other legal expenses. This Security Instrument shall remain in effect until released. Lender agrees to pay for any recordation costs of such release.

17. **ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) Environmental Law means all federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) Hazardous Substance means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substances," "hazardous waste" or "hazardous substance" under any Environmental Law.

   Mortgagor represents, warrants and agrees that:
   A. Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance has been, is, or will be located, transported, manufactured, treated, refined, or handled by any person on, under or about the Property, except in the ordinary course of business and in strict compliance with all applicable Environmental Law.

*(page 4 of 8)*

Experⓔ™ ©1993, 2001 Bankers Systems, Inc., St. Cloud, MN Form AGCO-RESI-IL 12/27/2002

B. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor has not and will not cause, contribute to, or permit the release of any Hazardous Substance on the Property.

C. Mortgagor will immediately notify Lender if (1) a release or threatened release of Hazardous Substance occurs on, under or about the Property or migrates or threatens to migrate from nearby property; or (2) there is a violation of any Environmental Law concerning the Property. In such an event, Mortgagor will take all necessary remedial action in accordance with Environmental Law.

D. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor and every tenant have been, are and shall remain in full compliance with any applicable Environmental Law and Mortgagor has no knowledge of or reason to believe there is any pending or threatened investigation, claim, or proceeding of any kind relating to (1) any Hazardous Substance located on, under or about the Property; or (2) any violation by Mortgagor or any tenant of any Environmental Law. Mortgagor will immediately notify Lender in writing as soon as Mortgagor has reason to believe there is any such pending or threatened investigation, claim, or proceeding. In such an event, Lender has the right, but not the obligation, to participate in any such proceeding including the right to receive copies of any documents relating to such proceedings.

E. Except as previously disclosed and acknowledged in writing to Lender, there are no underground storage tanks, private dumps or open wells located on or under the Property and no such tank, dump or well will be added unless Lender first consents in writing.

F. Mortgagor will permit, or cause any tenant to permit, Lender or Lender's agent to enter and inspect the Property and review all records at any reasonable time to determine (1) the existence, location and nature of any Hazardous Substance on, under or about the Property; (2) the existence, location, nature, and magnitude of any Hazardous Substance that has been released on, under or about the Property; or (3) whether or not Mortgagor and any tenant are in compliance with applicable Environmental Law.

G. Upon Lender's request and at any time, Mortgagor agrees, at Mortgagor's expense, to engage a qualified environmental engineer to prepare an environmental audit of the Property and to submit the results of such audit to Lender. The choice of the environmental engineer who will perform such audit is subject to Lender's approval.

H. Lender may perform any of Mortgagor's obligations under this section at Mortgagor's expense.

I. As a consequence of any breach of any representation, warranty or promise made in this section, (1) Mortgagor will indemnify and hold Lender and Lender's successors or assigns harmless from and against all losses, claims, demands, liabilities, damages, cleanup, response and remediation costs, penalties and expenses, including without limitation all costs of litigation and attorneys' fees, which Lender and Lender's successors or assigns may sustain; and (2) at Lender's discretion, Lender may release this Security Instrument and in return Mortgagor will provide Lender with collateral of at least equal value to the Property secured by this Security Instrument without prejudice to any of Lender's rights under this Security Instrument.

J. Notwithstanding any of the language contained in this Security Instrument to the contrary, the terms of this section shall survive any foreclosure or satisfaction of this Security Instrument regardless of any passage of title to Lender or any disposition by Lender of any or all of the Property. Any claims and defenses to the contrary are hereby waived.

**18. CONDEMNATION.** Mortgagor will give Lender prompt notice of any pending or threatened action, by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Mortgagor authorizes Lender to intervene in Mortgagor's name in any of the above described actions or claims. Mortgagor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds shall be considered payments and will be applied as provided in this Security Instrument. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

**19. INSURANCE.** Mortgagor agrees to maintain insurance as follows:

A. Mortgagor shall keep the Property insured against loss by fire, flood, theft and other hazards and risks reasonably associated with the Property due to its type and location. This insurance shall be maintained in the amounts and for the periods that Lender requires. What Lender requires pursuant to the preceding two sentences can change during the term of the Secured Debt. The insurance carrier providing the insurance shall be chosen by Mortgagor subject to Lender's approval, which shall not be unreasonably withheld. If Mortgagor fails to maintain the coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property according to the terms of this Security Instrument.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard "mortgage clause" and, where applicable, "loss payee clause." Mortgagor shall immediately notify Lender of cancellation or termination of the insurance. Lender shall have the right to hold the policies and renewals. If Lender requires, Mortgagor shall immediately give to Lender all receipts of paid premiums and renewal notices. Upon loss, Mortgagor shall give immediate notice to the insurance carrier and Lender. Lender may make proof of loss if not made immediately by Mortgagor.

*(page 5 of 8)*

Unless otherwise agreed in writing, all insurance proceeds shall be applied to restoration or repair of the Property or to the Secured Debt, whether or not then due, at Lender's option. Any application of proceeds to principal shall not extend or postpone the due date of scheduled payment nor change the amount of any payment. Any excess will be paid to the Mortgagor. If the Property is acquired by Lender, Mortgagor's right to any insurance policies and proceeds resulting from damage to the Property before the acquisition shall pass to Lender to the extent of the Secured Debt immediately before the acquisition.

B.   Mortgagor agrees to maintain comprehensive general liability insurance naming Lender as an additional insured in an amount acceptable to Lender, insuring against claims arising from any accident or occurrence in or on the Property.

C.   Mortgagor agrees to maintain rental loss or business interruption insurance, as required by Lender, in an amount equal to at least coverage of one year's debt service, and required escrow account deposits (if agreed to separately in writing), under a form of policy acceptable to Lender.

20. **ESCROW FOR TAXES AND INSURANCE.** Unless otherwise provided in a separate agreement, Mortgagor will not be required to pay to Lender funds for taxes and insurance in escrow.

21. **FINANCIAL REPORTS AND ADDITIONAL DOCUMENTS.** Mortgagor will provide to Lender upon request, any financial statement or information Lender may deem reasonably necessary. Mortgagor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Mortgagor's obligations under this Security Instrument and Lender's lien status on the Property.

22. **JOINT AND INDIVIDUAL LIABILITY; CO-SIGNERS; SUCCESSORS AND ASSIGNS BOUND.** All duties under this Security Instrument are joint and individual. If Mortgagor signs this Security Instrument but does not sign an evidence of debt, Mortgagor does so only to mortgage Mortgagor's interest in the Property to secure payment of the Secured Debt and Mortgagor does not agree to be personally liable on the Secured Debt. If this Security Instrument secures a guaranty between Lender and Mortgagor, Mortgagor agrees to waive any rights that may prevent Lender from bringing any action or claim against Mortgagor or any party indebted under the obligation. These rights may include, but are not limited to, any anti-deficiency or one-action laws. Mortgagor agrees that Lender and any party to this Security Instrument may extend, modify or make any change in the terms of this Security Instrument or any evidence of debt without Mortgagor's consent. Such a change will not release Mortgagor from the terms of this Security Instrument. The duties and benefits of this Security Instrument shall bind and benefit the successors and assigns of Mortgagor and Lender.

23. **APPLICABLE LAW; SEVERABILITY; INTERPRETATION.** This Security Instrument is governed by the laws of the jurisdiction in which Lender is located, except to the extent otherwise required by the laws of the jurisdiction where the Property is located. This Security Instrument is complete and fully integrated. This Security Instrument may not be amended or modified by oral agreement. Any section in this Security Instrument, attachments, or any agreement related to the Secured Debt that conflicts with applicable law will not be effective, unless that law expressly or impliedly permits the variations by written agreement. If any section of this Security Instrument cannot be enforced according to its terms, that section will be severed and will not affect the enforceability of the remainder of this Security Instrument. Whenever used, the singular shall include the plural and the plural the singular. The captions and headings of the sections of this Security Instrument are for convenience only and are not to be used to interpret or define the terms of this Security Instrument. Time is of the essence in this Security Instrument.

24. **NOTICE.** Unless otherwise required by law, any notice shall be given by delivering it or by mailing it by first class mail to the appropriate party's address on page 1 of this Security Instrument, or to any other address designated in writing. Notice to one mortgagor will be deemed to be notice to all mortgagors.

25. **WAIVERS.** Except to the extent prohibited by law, Mortgagor hereby waives and releases any and all rights and remedies Mortgagor may now have or acquire in the future relating to the right of homestead exemption, redemption, reinstatement, appraisement, the marshalling of liens and assets and all other exemptions as to the Property.

26. **MAXIMUM OBLIGATION LIMIT.** The total principal amount secured by this Security Instrument at any one time shall not exceed $ 286,580.00 . This limitation of amount does not include interest, attorneys fees, and other fees and charges validly made pursuant to this Security Instrument. Also, this limitation does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

27. **U.C.C. PROVISIONS.** If checked, the following are applicable to, but do not limit, this Security Instrument:

☐ **Construction Loan.** This Security Instrument secures an obligation incurred for the construction of an improvement on the Property.

☐ **Fixture Filing.** Mortgagor grants to Lender a security interest in all goods that Mortgagor owns now or in the future and that are or will become fixtures related to the Property.

☐ **Crops; Timber; Minerals; Rents, Issues and Profits.** Mortgagor grants to Lender a security interest in all crops, timber and minerals located on the Property as well as all rents, issues, and profits of them including, but not limited to, all Conservation Reserve Program (CRP) and Payment in Kind (PIK) payments and similar governmental programs (all of which shall also be included in the term "Property").

*(page 6 of 8)*

☐ **Personal Property.** Mortgagor grants to Lender a security interest in all personal property located on or connected with the Property, including all farm products, inventory, equipment, accounts, documents, instruments, chattel paper, general intangibles, and all other items of personal property Mortgagor owns now or in the future and that are used or useful in the construction, ownership, operation, management, or maintenance of the Property (all of which shall also be included in the term "Property"). The term "personal property" specifically excludes that property described as "household goods" secured in connection with a "consumer" loan as those terms are defined in applicable federal regulations governing unfair and deceptive credit practices.

☐ **Filing As Financing Statement.** Mortgagor agrees and acknowledges that this Security Instrument also suffices as a financing statement and any carbon, photographic or other reproduction may be filed of record for purposes of Article 9 of the Uniform Commercial Code.

**28. OTHER TERMS.** If checked, the following are applicable to this Security Instrument:

☐ **Line of Credit.** The Secured Debt includes a revolving line of credit provision. Although the Secured Debt may be reduced to a zero balance, this Security Instrument will remain in effect until released.

☐ **Separate Assignment.** The Mortgagor has executed or will execute a separate assignment of leases and rents. If the separate assignment of leases and rents is properly executed and recorded, then the separate assignment will supersede this Security Instrument's "Assignment of Leases and Rents" section.

**SIGNATURES:** By signing below, Mortgagor agrees to the terms and covenants contained in this Security Instrument and in any attachments. Mortgagor also acknowledges receipt of a copy of this Security Instrument on the date stated on page 1.

Entity Name: _____

_____ _____
(Signature) Jin Hwi Lee           (Date)    (Signature)           (Date)

_____ _____
(Signature)           (Date)    (Signature)           (Date)

**ACKNOWLEDGMENT:**

(Individual)   STATE OF Illinois_____ , COUNTY OF _____ } ss.
This instrument was acknowledged before me this ____30th____ day of _____December, 2011_____
by Jin Hwi Lee_____ .
My commission expires:

```
OFFICIAL SEAL
MIN J. JUNG
Notary Public - State of Illinois
My Commission Expires Apr 23, 2013
```

_____
(Notary Public)

STATE OF _____ , COUNTY OF _____ } ss.

**(Business or Entity Acknowledgment)** This instrument was acknowledged before me this _____ day of _____

by _____

_____ (Title(s))

of_____ (Name of Business or Entity)

a _____ on behalf of the business or entity.

My commission expires:

_____
(Notary Public)

Express™  ©1993, 2001 Bankers Systems, Inc., St. Cloud, MN Form AGCO-RESI-IL 12/27/2002

"EXHIBIT A"

LOT 71 SUBDIVISIION OF BLOCK 12 IN CANAL TRUSTEE'S SUBDIVISION OF THE WEST PART OF SECTION 5, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN (EXCEPT THE SOUTH EAST 1/4 OF THE NORTHWEST 1/4 AND THE NORTHEAST 1/4 OF THE SOUTHWEST 1/4) IN COOK COUNTY, ILLINOIS.

Commonly Known As :   1205 N Milwaukee Ave, Chicago, IL60622

Permanent Index Number(s):   17-05-115-085-0000

"EXHIBIT B"

| | | |
|---|---|---|
| Jin Hwi Lee<br>175 E. Delaware Pl. #5805<br>Chicago, IL 60611 | Foster Bank<br>5005 NEWPORT DRIVE<br>ROLLING MEADOWS, IL 60008 | Loan Number 120800000003<br>Date 12-30-2011<br>Maturity Date 01-01-2017<br>Loan Amount $ 286,580.00<br>Renewal Of _____ |
| **BORROWER'S NAME AND ADDRESS**<br>"I" includes each borrower above, jointly and severally. | **LENDER'S NAME AND ADDRESS**<br>"You" means the lender, its successors and assigns. | |

For value received, I promise to pay to you, or your order, at your address listed above the **PRINCIPAL** sum of  two hundred eighty six thousand five hundred
eighty and no/100 _____ Dollars $ 286,580.00 _____

☒ **Single Advance:** I will receive all of this principal sum on _____ 12-30-2011 _____ . No additional advances are contemplated under this note.

☐ **Multiple Advance:** The principal sum shown above is the maximum amount of principal I can borrow under this note. On _____
_____ I will receive the amount of $ _____ and future principal advances are contemplated.
**Conditions:** The conditions for future advances are _____
_____
_____

☐ **Open End Credit:** You and I agree that I may borrow up to the maximum amount of principal more than one time. This feature is subject to
all other conditions and expires on _____ .
☐ **Closed End Credit:** You and I agree that I may borrow up to the maximum only one time (and subject to all other conditions).

**INTEREST:** I agree to pay interest on the outstanding principal balance from _____ 12-30-2011 _____ at the rate of _____ 6.750 %
per year until 01-01-2017 .

☐ **Variable Rate:** This rate may then change as stated below.
  ☐ **Index Rate:** The future rate will be _____ the following index rate: _____
_____
_____

  ☐ **No Index:** The future rate will not be subject to any internal or external index. It will be entirely in your control.
  ☐ **Frequency and Timing:** The rate on this note may change as often as _____
    A change in the interest rate will take effect _____
  ☐ **Limitations:** During the term of this loan, the applicable annual interest rate will not be more than _____ % or less than
    _____ %. The rate may not change more than _____ % each _____ .
  **Effect of Variable Rate:** A change in the interest rate will have the following effect on the payments:
  ☐ The amount of each scheduled payment will change.   ☐ The amount of the final payment will change.
  ☐ _____

**ACCRUAL METHOD:** Interest will be calculated on a _____ Actual/360 _____ basis.

**POST MATURITY RATE:** I agree to pay interest on the unpaid balance of this note owing after maturity, and until paid in full, as stated below:
  ☒ on the same fixed or variable rate basis in effect before maturity (as indicated above).
  ☐ at a rate equal to _____ .

☒ **LATE CHARGE:** If a payment is made more than _____ 15 _____ days after it is due, I agree to pay a late charge of 5.000% of the late amount with a
min of $25.00 _____ .

☐ **RETURN CHECK CHARGE.** I agree to pay the greater of $ _____ or all costs and expenses incurred in connection with any payment
on this loan that is returned because it has been dishonored.

☐ **ADDITIONAL CHARGES:** In addition to interest, I agree to pay the following charges which ☐ are ☐ are not included in the principal amount
above: _____

**PAYMENTS:** I agree to pay this note as follows:
59 monthly payments of $2,535.97 beginning 02-01-2012 and 1 balloon payment of $224,924.70 on 01-01-2017.

Prepayment Penalties: If the Lender receives a prepayment on or before the 1st anniversary of the date of the first payment due date of the Note, the Penalty shall be equal to 5% of
the remaining Principal balance of the Note. If the Lender receives a prepayment after the 1st anniversary but on or before the 2nd anniversary of the date of the first payment due
date of the Note, the Penalty shall be equal to 4% of the remaining Principal balance of the Note. If the Lender receives a prepayment after the 2nd anniversary but on or before the
3rd anniversary of the date of the first payment due date of the Note, the Penalty shall be equal to 3% of the remaining Principal balance of the Note. If the Lender receives a
prepayment after the 3rd anniversary but on or before the 4th anniversary of the date of the first payment due date of the Note, the Penalty shall be equal to 2% of the remaining
Principal balance of the Note. If the Lender receives a prepayment after the 4th anniversary of the date of the first payment due date of the Note, but before the due date of the Note,
the Penalty shall be equal to 1% of the remaining Principal balance of the Note.

**ADDITIONAL TERMS:**

First mortgage and an assignment of rents against the commercial property located at 1205 North Milwaukee Avenue, Chicago, IL 60622

| | |
|---|---|
| ☐ **SECURITY:** This note is separately secured by (describe separate document by type and date):<br><br>(This section is for your internal use. Failure to list a separate security document does not mean the agreement will not secure this note.)<br>Signature for Lender | **PURPOSE:** The purpose of this loan is refinancing existing loan#1208000-1 <br><br>☐ **CONFESSION OF JUDGMENT:** I agree to the terms of the "Confession of Judgment" paragraph on page 2.<br>**SIGNATURES: I AGREE TO THE TERMS OF THIS NOTE (INCLUDING THOSE ON PAGE 2).** I have received a copy on today's date.<br><br>Jin Hwi Lee _____ |

Dong Hoon Kim

Witness by:
~~MAIN H Mart~~
Name: Min Jin Date: 12/30/11

UNIVERSAL NOTE
Expert © 1984, 1991 Bankers Systems, Inc., St. Cloud, MN Form UN-IL 3/6/2002

(page 1 of 2)

**DEFINITIONS:** As used on page 1, "I," "X" means the terms that apply to this loan. "I," "me" or "my" means each Borrower who signs this note and each other person or legal entity (including guarantors, endorsers, and sureties) who agrees to pay this note (together referred to as "us"). "You" or "your" means the Lender and its successors and assigns.

**APPLICABLE LAW:** The law of the state of Illinois will govern this note. Any term of this note which is contrary to applicable law will not be effective, unless the law permits you and me to agree to such a variation. If any provision of this agreement cannot be enforced according to its terms, this fact will not affect the enforceability of the remainder of this agreement. No modification of this agreement may be made without your express written consent. Time is of the essence in this agreement.

**COMMISSIONS OR OTHER REMUNERATION:** I understand and agree that any insurance premiums paid to insurance companies as part of this note will involve money retained by you or paid back to you as commissions or other remuneration.

**PAYMENTS:** Each payment I make on this note will first reduce the amount I owe you for charges which are neither interest nor principal. The remainder of each payment will then reduce accrued unpaid interest, and then unpaid principal. If you and I agree to a different application of payments, we will describe our agreement on this note. I may prepay a part of, or the entire balance of this loan without penalty, unless we specify to the contrary on this note. Any partial prepayment will not excuse or reduce any later scheduled payment until this note is paid in full (unless, when I make the prepayment, you and I agree in writing to the contrary).

**INTEREST:** Interest accrues on the principal remaining unpaid from time to time, until paid in full. If I receive the principal in more than one advance, each advance will start to earn interest only when I receive the advance. The interest rate in effect on this note at any given time will apply to the entire principal advanced at that time. Notwithstanding anything to the contrary, I do not agree to pay and you do not intend to charge any rate of interest that is higher than the maximum rate of interest you could charge under applicable law for the extension of credit that is agreed to here (either before or after maturity). If any notice of interest accrual is sent and is in error, we mutually agree to correct it, and if you actually collect more interest than allowed by law and this agreement, you agree to refund it to me.

**INDEX RATE:** The index will serve only as a device for setting the rate on this note. You do not guarantee by selecting this index, or the margin, that the rate on this note will be the same rate you charge on any other loans or class of loans to me or other borrowers.

**ACCRUAL METHOD:** The amount of interest that I will pay on this loan will be calculated using the interest rate and accrual method stated on page 1 of this note. For the purpose of interest calculation, the accrual method will determine the number of days in a "year." If no accrual method is stated, then you may use any reasonable accrual method for calculating interest.

**POST MATURITY RATE:** For purposes of deciding when the "Post Maturity Rate" (shown on page 1) applies, the term "maturity" means the date of the last scheduled payment indicated on page 1 of this note or the date you accelerate payment on the note, whichever is earlier.

**SINGLE ADVANCE LOANS:** If this is a single advance loan, you and I expect that you will make only one advance of principal. However, you may add other amounts to the principal if you make any payments described in the "PAYMENTS BY LENDER" paragraph below.

**MULTIPLE ADVANCE LOANS:** If this is a multiple advance loan, you and I expect that you will make more than one advance of principal. If this is closed end credit, repaying a part of the principal will not entitle me to additional credit.

**PAYMENTS BY LENDER:** If you are authorized to pay, on my behalf, charges I am obligated to pay (such as property insurance premiums), then you may treat those payments made by you as advances and add them to the unpaid principal under this note, or you may demand immediate payment of the charges.

**SET-OFF:** I agree that you may set off any amount due and payable under this note against any right I have to receive money from you.

"Right to receive money from you" means:
(1) any deposit account balance I have with you;
(2) any money owed to me on an item presented to you or in your possession for collection or exchange; and
(3) any repurchase agreement or other nondeposit obligation.

"Any amount due and payable under this note" means the total amount of which you are entitled to demand payment under the terms of this note at the time you set off. This total includes any balance the due date for which you properly accelerate under this note.

If my right to receive money from you is also owned by someone who has not agreed to pay this note, your right of set-off will apply to my interest in the obligation and to any other amounts I could withdraw on my sole request or endorsement. Your right of set-off does not apply to an account or other obligation where my rights are only as a representative. It also does not apply to any Individual Retirement Account or other tax-deferred retirement account.

You will not be liable for the dishonor of any check when the dishonor occurs because you set off this debt against any of my accounts. I agree to hold you harmless from any such claims arising as a result of your exercise of your right of set-off.

**REAL ESTATE OR RESIDENCE SECURITY:** If this note is secured by real estate or a residence that is personal property, the existence of a default and your remedies for such a default will be determined by applicable law, by the terms of any separate instrument creating the security interest and, to the extent not prohibited by law and not contrary to the terms of the separate security instrument by the "Default" and "Remedies" paragraphs herein.

**DEFAULT:** I will be in default if any one or more of the following occur: (1) I fail to make a payment on time or in the amount due; (2) I fail to keep the property insured, if required; (3) I fail to pay, or keep any promise, on any debt or agreement I have with you; (4) any other creditor of mine attempts to collect any debt I owe him through court proceedings; (5) I die, am declared incompetent, make an assignment for the benefit of creditors, or become insolvent (either because my liabilities exceed my assets or I am unable to pay my debts as they become due); (6) I make any written statement or provide any financial information that is untrue or inaccurate at the time it was provided; (7) I do or fail to do something which causes you to believe that you will have difficulty collecting the amount I owe you; (8) any collateral securing this note is used in a manner or for a purpose which threatens confiscation by a legal authority; (9) I change my name or assume an additional name without first notifying you before making such a change; (10) I fail to plant, cultivate and harvest crops in due season if I am a producer of crops; (11) any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity, as further explained in 7 C.F.R. Part 1940, Subpart G, Exhibit M.

**REMEDIES:** If I am in default on this note you have, but are not limited to, the following remedies:
(1) You may demand immediate payment of all I owe you under this note (principal, accrued unpaid interest and other accrued charges).
(2) You may set off this debt against any right I have to the payment of money from you, subject to the terms of the "Set-Off" paragraph herein.
(3) You may demand security, additional security, or additional parties to be obligated to pay this note as a condition for not using any other remedy.
(4) You may refuse to make advances to me or allow purchases on credit by me.
(5) You may use any remedy you have under state or federal law.

By selecting any one or more of these remedies you do not give up your right to later use any other remedy. By waiving your right to declare an event to be a default, you do not waive your right to later consider the event as a default if it continues or happens again.

**CONFESSION OF JUDGMENT:** If agreed on page 1, then, in addition to your remedies listed herein, I authorize any attorney to appear in any court of record having jurisdiction over this matter and to confess judgment, without process, against me, in favor of you, for any unpaid principal, accrued interest and accrued charges due on this agreement, together with collection costs including reasonable attorney's fees.

**COLLECTION COSTS AND ATTORNEY'S FEES:** I agree to pay all costs of collection, replevin or any other or similar type of cost if I am in default. In addition, if you hire an attorney to collect this note, I also agree to pay any fee you incur with such attorney plus court costs (except where prohibited by law). To the extent permitted by the United States Bankruptcy Code, I also agree to pay the reasonable attorney's fees and costs you incur to collect this debt as awarded by any court exercising jurisdiction under the Bankruptcy Code.

**WAIVER:** I give up my rights to require you to do certain things. I will not require you to:
(1) demand payment of amounts due (presentment);
(2) obtain official certification of nonpayment (protest); or
(3) give notice that amounts due have not been paid (notice of dishonor).

I waive any defenses I have based on suretyship or impairment of collateral.

**OBLIGATIONS INDEPENDENT:** I understand that I must pay this note even if someone else has also agreed to pay it (by, for example, signing this form or a separate guarantee or endorsement). You may sue me alone, or anyone else who is obligated on this note, or any number of us together, to collect this note. You may do so without any notice that it has not been paid (notice of dishonor). You may without notice release any party to this agreement without releasing any other party. If you give up any of your rights, with or without notice, it will not affect my duty to pay this note. Any extension of new credit to any of us, or renewal of this note by all or less than all of us will not release me from my duty to pay it. (Of course, you are entitled to only one payment in full.) I agree that you may at your option extend this note or the debt represented by this note, or any portion of the note or debt, from time to time. Without limit or notice and for any term without affecting my liability for payment of the note. I will not assign my obligation under this agreement without your prior written approval.

**FINANCIAL INFORMATION:** I agree to provide you, upon request, any financial statement or information you may deem necessary. I warrant that the financial statements and information I provide to you are or will be accurate, correct and complete.

**NOTICE:** Unless otherwise required by law, any notice to me shall be given by delivering it or by mailing it by first class mail addressed to me at my last known address. My current address is on page 1. I agree to inform you in writing of any change in my address. I will give any notice to you by mailing it first class to your address stated on page 1 of this agreement, or to any other address that you have designated.

| DATE OF TRANSACTION | PRINCIPAL ADVANCE | BORROWER'S INITIALS (not required) | PRINCIPAL PAYMENTS | PRINCIPAL BALANCE | INTEREST RATE | INTEREST PAYMENTS | INTEREST PAID THROUGH |
|---|---|---|---|---|---|---|---|
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |
| | $ | | $ | $ | % | $ | |

# Exhibit C

**APPROVED**
July 30, 2013
Jan Lynn Owen
Commissioner of
Business Oversight

By *Wallace M. Wong*
Wallace M. Wong
Senior Counsel

**FILED**
12:02 a.m. Pacific Time August 13, 2013
Jan Lynn Owen
Commissioner of Business Oversight
State of California

By *Wallace M. Wong*
Wallace M. Wong
Senior Counsel

A0744288

**FILED** *Ex* D4
**Secretary of State**
**State of California**

AUG 0 7 2013

*3 u*

*1338540 SUN*

## AGREEMENT OF BANK MERGER

This AGREEMENT OF BANK MERGER, dated as of July 24, 2013 (this "Bank Merger Agreement"), is entered into between BBCN Bank, ("Acquirer Bank"), a California state-chartered bank and a wholly-owned subsidiary of BBCN Bancorp, Inc., a Delaware corporation ("BBCN"), and Foster Bank ("Target Bank"), an Illinois state-chartered commercial bank and a wholly owned subsidiary of Foster Bankshares, Inc., a Delaware corporation ("Foster"). Acquirer Bank and Target Bank are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

WHEREAS, BBCN, Won Merger Sub Corp., a Delaware corporation ("Merger Sub"), and Foster entered into an Agreement and Plan of Merger, dated as of April 15, 2013 (the "Holding Company Merger Agreement"), providing, among other things, for the merger of Merger Sub with and into Foster (the "Merger");

WHEREAS, in connection with the Merger, BBCN and Foster desire to merge Target Bank with and into Acquirer Bank (the "Bank Merger") concurrently with or as soon as reasonably practicable after the consummation of the Merger upon the terms and subject to the conditions set forth in this Bank Merger Agreement and the Holding Company Merger Agreement; and

WHEREAS, the Parties intend that for federal income tax purposes the Bank Merger shall qualify as a "reorganization" within the meaning of Section 368(a) of the Internal Revenue Code of 1986, as amended (the "Code"), and that this Bank Merger Agreement shall constitute a "plan of reorganization" for purposes of Sections 354 and 361 of the Code;

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Bank Merger Agreement and the Holding Company Merger Agreement, subject to the conditions set forth in this Bank Merger Agreement and the Holding Company Merger Agreement, and intending to be legally bound hereby, the Parties agree as follows:

1. <u>Effective Time</u>. Upon the terms and subject to the conditions set forth in this Bank Merger Agreement and the Holding Company Merger Agreement, concurrently with or as soon as reasonably practicable after the consummation of the Merger, Acquirer Bank and Target Bank shall cause the Bank Merger to be consummated by (i) filing a copy of this Bank Merger Agreement, certified by the Secretary of State of the State of California pursuant to Section 1103 of the California General Corporation Law (the "CGCL"), with the Department of Business Oversight of the State of California pursuant to Section 4887 of the California Financial Code and (ii) filing a copy of this Bank Merger Agreement, together with all other required documents and information, pursuant to Chapter 205, Section 5/24 of the Illinois Compiled Statutes (the "ILCS") with the Illinois Department of Financial and Professional Regulation. The Bank Merger shall become effective as provided in Section 4887 of the California Financial Code (the "Effective Time").

2.    The Merger. Acquirer Bank shall be the surviving bank in the Bank Merger (the "Surviving Bank").  At the Effective Time, Target Bank shall be merged with and into Acquirer Bank and the separate existence of Target Bank shall cease.  The Bank Merger shall be governed by, and shall have the effects set forth in, the CGCL and the ILCS.

3.    Effects of the Merger.

(a)    At the Effective Time, the Surviving Bank shall succeed, without other transfer, to all the rights and properties, and shall be subject to all the debts and liabilities, of Target Bank, and the separate existence of Acquirer Bank, with all its purposes, objects, rights, powers, privileges, liabilities, obligations and franchises, shall continue unaffected and unimpaired by the Bank Merger.

(b)    The articles of incorporation (as amended effective as of the Effective Time to reflect the new name of the Surviving Bank) and the bylaws of Acquirer Bank, as in effect as of the Effective Time, shall be the articles of incorporation and bylaws of the Surviving Bank, until thereafter altered, amended or repealed in accordance with their terms and applicable law.

(c)    The shares of Target Bank common stock, $20.00 par value per share ("Target Bank Common Stock") and the shares of Acquirer Bank common stock, no par value per share ("Acquirer Bank Common Stock"), shall be treated as follows at the Effective Time: (i) each share of Target Bank Common Stock issued and outstanding immediately prior to the Effective Time shall be automatically canceled without consideration and cease to be an issued and outstanding share of Target Bank Common Stock; and (ii) each share of Acquirer Bank Common Stock issued and outstanding immediately prior to the Effective Time shall remain issued and outstanding.

4.    Directors and Officers of the Surviving Bank. The directors and officers of Acquirer Bank shall be the directors and officers of the Surviving Bank without change in title or authority, but subject to the authority and power of the board of directors and the sole stockholder of the Surviving Bank to add directors or officers to, or otherwise modify, the board of directors or number, titles and authority of the officers of the Surviving Bank.

5.    Procurement of Approvals. This Bank Merger Agreement shall be subject to the approval of BBCN, as the sole stockholder of Acquirer Bank, and Foster, as the sole stockholder of Target Bank, at meetings to be called and held or by consent in lieu thereof in accordance with the applicable provisions of law and their respective organizational documents. Acquirer Bank and Target Bank shall use their commercially reasonable best efforts to proceed expeditiously and cooperate fully in the procurement of any other consents and approvals and in the taking of any other action, and the satisfaction of all other requirements prescribed by applicable law or otherwise necessary for the consummation of the Bank Merger on the terms provided herein, including, without limitation, the preparation and submission of such applications or other filings for approval of the Bank Merger as may be required by applicable laws and regulations.

6.    Conditions Precedent. The obligations of the Parties under this Bank Merger Agreement shall be subject to: (a) the approvals of this Bank Merger Agreement by BBCN, as

the sole stockholder of Acquirer Bank, and by Foster, as the sole stockholder of Target Bank, at meetings duly called and held or by consent or consents in lieu thereof, in each case without any exercise of such dissenters' rights as may be applicable; (b) receipt of approval of the Bank Merger from all governmental and banking authorities whose approval is required by applicable laws and regulations; and (c) the consummation of the Merger pursuant to the Holding Company Merger Agreement at or before the Effective Time.

      7.     <u>General Provisions</u>.

      (a)     <u>Termination and Agreement</u>. The obligations of the Parties to effect the Bank Merger shall be subject to all the terms and conditions contained in the Holding Company Merger Agreement. This Bank Merger Agreement shall terminate, without any further action of any Party, notwithstanding stockholder approval, in the event that the Holding Company Merger Agreement shall be terminated as provided therein prior to the Effective Time.

      (b)     <u>Amendment</u>. This Bank Merger Agreement may not be amended, modified or supplemented except by an instrument in writing signed on behalf of each of the Parties at any time prior to the Effective Time.

      (c)     <u>Successors and Assigns</u>. This Bank Merger Agreement shall be binding upon and enforceable by the Parties and their respective successors and permitted assigns, but this Bank Merger Agreement may not be assigned by any Party, by operation of law or otherwise, without the prior written consent of the other Party.

      (d)     <u>Governing Law</u>. This Bank Merger Agreement shall be governed by and construed in accordance with the laws of the State of California (without giving effect to choice of law principles thereof).

      (e)     <u>Counterparts</u>. This Bank Merger Agreement may be executed in counterparts (which counterparts may be delivered by facsimile or other commonly used electronic means), each of which shall be considered one and the same agreement and shall become effective when both counterparts have been signed by each of the Parties and delivered to the other Party, it being understood that both Parties need not sign the same counterpart.

*[Signature page follows.]*

IN WITNESS WHEREOF, the Parties have caused this Bank Merger Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

BBCN Bank

By: _____
Name: Soo Bong Min
Title: President and Chief Executive Officer

By: _____
Name: Juliet Stone
Title: Secretary

Foster Bank

By: _____
Name: Paul B. Kim
Title: President

By: _____
Name: Kurt C. Felde
Title: Secretary

*Signature Page to Agreement of Bank Merger*

IN WITNESS WHEREOF, the Parties have caused this Bank Merger Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

BBCN Bank

By: _____
    Name: Soo Bong Min
    Title: President and Chief Executive Officer

By: _____
    Name: Juliet Stone
    Title: Secretary

Foster Bank

By: _____
    Name: Paul B. Kim
    Title: President

By: _____
    Name: Kurt C. Felde
    Title: Secretary

*Signature Page to Agreement of Bank Merger*

IN WITNESS WHEREOF, the Parties have caused this Bank Merger Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

BBCN Bank

By: _____
Name: Soo Bong Min
Title: President and Chief Executive Officer

By: _____
Name: Juliet Stone
Title: Secretary

Foster Bank

By: _____
Name: Paul B. Kim
Title: President

By: _____
Name: Kurt C. Felde
Title: Secretary

*Signature Page to Agreement of Bank Merger*

IN WITNESS WHEREOF, the Parties have caused this Bank Merger Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

BBCN Bank

By: _____
Name: Soo Bong Min
Title: President and Chief Executive Officer

By: _____
Name: Juliet Stone
Title: Secretary

Foster Bank

By: _____
Name: Paul B. Kim
Title: President

By: _____
Name: Kurt C. Felde
Title: Secretary

*Signature Page to Agreement of Bank Merger*

A0786896

1338540 surv

APPROVED
July 25, 2016
Jan Lynn Owen
Commissioner of
Business Oversight

By Wallace M Wong
Wallace M. Wong
Senior Counsel

FILED
Secretary of State
State of California

JUL 29 2016

## AGREEMENT OF BANK MERGER

THIS AGREEMENT OF BANK MERGER, dated as of July 25, 2016 (this "Bank Merger Agreement"), is entered into between Wilshire Bank, a California state-chartered bank and a wholly owned subsidiary of Wilshire Bancorp, Inc., a California corporation ("WIBC"), and BBCN Bank, a California state-chartered bank and a wholly owned subsidiary of BBCN Bancorp, Inc., a Delaware corporation ("BBCN"). Wilshire Bank and BBCN Bank are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

WHEREAS, WIBC and BBCN entered into an Agreement and Plan of Merger, dated as of December 7, 2015 (the "Agreement"), providing, among other things, for the merger of WIBC with and into BBCN, with BBCN surviving (the "Merger");

WHEREAS, in connection with the Merger, WIBC and BBCN desire to merge Wilshire Bank with and into BBCN Bank (the "Bank Merger") concurrently with or as soon as reasonably practicable after the consummation of the Merger upon the terms and subject to the conditions set forth in this Bank Merger Agreement and the Agreement; and

WHEREAS, for federal and, if applicable, state and local income tax purposes, the Parties intend that the Bank Merger shall qualify as a "reorganization" under Section 368(a) of the Internal Revenue Code of 1986, as amended (the "Code"), and this Agreement, shall constitute a "plan of reorganization" within the meaning of the Code.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Bank Merger Agreement and the Agreement, subject to the conditions set forth in this Bank Merger Agreement and the Agreement, and intending to be legally bound hereby, the Parties agree as follows:

1. Effective Time. Upon the terms and subject to the conditions set forth in this Bank Merger Agreement and the Agreement, concurrently with or as soon as reasonably practicable after the consummation of the Merger, Wilshire Bank and BBCN Bank shall cause the Bank Merger to be consummated by filing a copy of this Bank Merger Agreement, certified by the Secretary of State of the State of California pursuant to Section 1103 of the California General Corporation Law (the "CGCL"), with the Commissioner of Business Oversight of the State of California pursuant to Section 4887 of the California Financial Code (the "CFC"). The Bank Merger shall become effective at the close of business at 5:02 pm Pacific Daylight Time on the date of such filing (the "Effective Time").

2. The Merger. BBCN Bank shall be the surviving bank in the Bank Merger (the "Surviving Bank"). At the Effective Time, Wilshire Bank shall be merged with and into BBCN Bank and the separate existence of Wilshire Bank shall cease. The Bank Merger shall be governed by, and shall have the effects set forth in, the CGCL and the CFC.

FILED
5:02 p.m. Pacific Time
July 29, 2016
Jan Lynn Owen
Commissioner of Business Oversight
State of California.

By Wallace M Wong
Wallace M. Wong
Senior Counsel

la-1304419

A0786896

3.    Effects of the Merger.

(a)    At the Effective Time, Article One of the Articles of Incorporation of BBCN Bank, as amended, shall be amended in its entirety to read as follows:

"ARTICLE ONE. NAME: The name of this Corporation is Bank of Hope."

(b)    . At the Effective Time, the Surviving Bank shall succeed, without other transfer, to all the rights and properties, and shall be subject to all the debts and liabilities, of Wilshire Bank, and the separate existence of BBCN Bank, with all its purposes, objects, rights, powers, privileges, liabilities, obligations and franchises, shall continue unaffected and unimpaired by the Bank Merger.

(c)    The Articles of Incorporation (as amended effective as of the Effective Time to reflect the new name of the Surviving Bank pursuant to Section 3(a)) and the Bylaws of BBCN Bank, as in effect as of the Effective Time, shall be the Articles of Incorporation and Bylaws of the Surviving Bank, until thereafter altered, amended or repealed in accordance with their terms and applicable law.

(d)    The shares of BBCN Bank common stock, no par value per share ("BBCN Bank Common Stock") and the shares of Wilshire Bank common stock, no par value per share ("Wilshire Bank Common Stock") shall be treated as follows at the Effective Time: (i) each share of BBCN Bank Common Stock issued and outstanding immediately prior to the Effective Time shall remain an issued and outstanding share of BBCN Bank Common Stock; and (ii) each share of Wilshire Bank Common Stock issued and outstanding immediately prior to the Effective Time shall be automatically canceled by operation of law without consideration and cease to be an issued and outstanding share of Wilshire Bank Common Stock.

4.    Directors and Officers of the Surviving Bank. On or prior to the Effective Time, BBCN Bank shall cause the number of directors that shall comprise the board of directors of the Surviving Bank at the Effective Time to be 16. Of the members of the initial board of directors of the Surviving Bank at the Effective Time, nine (9) shall be current members of the board of directors of BBCN Bank as designated by BBCN Bank prior to the Effective Time, and seven (7) shall be current members of the board of directors of Wilshire Bank as designated by Wilshire Bank prior to the Effective Time.

5.    Procurement of Approvals. This Bank Merger Agreement shall be subject to the approval of WIBC, as the sole shareholder of Wilshire Bank, and BBCN, as the sole shareholder of BBCN Bank, at meetings to be called and held or by consent in lieu thereof in accordance with the applicable provisions of law and their respective organizational documents. Wilshire Bank and BBCN Bank shall use their commercially reasonable best efforts to proceed expeditiously and cooperate fully in the procurement of any other consents and approvals and in the taking of any other action, and the satisfaction of all other requirements prescribed by applicable law or otherwise necessary for the consummation of the Bank Merger on the terms provided herein, including, without limitation, the preparation and submission of such applications or other filings for approval of the Bank Merger as may be required by applicable laws and regulations.

A0786895

6.    Conditions Precedent. The obligations of the Parties under this Bank Merger Agreement shall be subject to: (a) the approvals of this Bank Merger Agreement by WIBC, as the sole shareholder of Wilshire Bank, and BBCN, as the sole shareholder of BBCN Bank, at meetings duly called and held or by consent or consents in lieu thereof, in each case without any exercise of such dissenters' rights as may be applicable; (b) receipt of approval of the Bank Merger from all governmental and banking authorities whose approval is required by applicable laws and regulations; and (c) the consummation of the Merger pursuant to the Agreement at or before the Effective Time.

7.    General Provisions.

(a)    Termination and Agreement. The obligations of the Parties to effect the Bank Merger shall be subject to all the terms and conditions contained in the Agreement. This Bank Merger Agreement shall terminate, without any further action of any Party, notwithstanding shareholder approval, in the event that the Agreement shall be terminated as provided therein prior to the Effective Time.

(b)    Amendment. This Bank Merger Agreement may not be amended, modified or supplemented except by an instrument in writing signed on behalf of each of the Parties at any time prior to the Effective Time.

(c)    Successors and Assigns. This Bank Merger Agreement shall be binding upon and enforceable by the Parties and their respective successors and permitted assigns, but this Bank Merger Agreement may not be assigned by any Party, by operation of law or otherwise, without the prior written consent of the other Party.

(d)    Governing Law. This Bank Merger Agreement shall be governed by and construed in accordance with the laws of the State of California (without giving effect to choice of law principles thereof).

(e)    Counterparts. This Bank Merger Agreement may be executed in counterparts (which counterparts may be delivered by facsimile or other commonly used electronic means), each of which shall be considered one and the same agreement and shall become effective when both counterparts have been signed by each of the Parties and delivered to the other Party, it being understood that both Parties need not sign the same counterpart.

[Remainder of this page intentionally left blank]

la-1304419

3

A0786895

IN WITNESS WHEREOF, Wilshire Bank and BBCN Bank have caused this Bank Merger Agreement to be signed by their respective officers thereunto duly authorized, all as of the date first set forth above.

WILSHIRE BANK

By: _____

Name: Jae Whan Yoo

Title: President & Chief Executive Officer

By: _____

Name: Lisa K. Pai

Title: Secretary


BBCN BANK

By: _____

Name: Kevin S. Kim

Title: President & Chief Executive Officer

By: _____

Name: David W. Kim

Title: Secretary

[Signature Page to Agreement of Bank Merger]

la-1304419

A0786896

IN WITNESS WHEREOF, Wilshire Bank and BBCN Bank have caused this Bank Merger Agreement to be signed by their respective officers thereunto duly authorized, all as of the date first set forth above.

**WILSHIRE BANK**

By: _____
Name: Jae Whan Yoo
Title: President & Chief Executive Officer

By: _____
Name: Lisa K. Pai
Title: Secretary

**BBCN BANK**

By: _____
Name: Kevin S. Kim
Title: President & Chief Executive Officer

By: _____
Name: David W. Kim
Title: Secretary

[Signature Page to Agreement of Bank Merger]

la-1304419

# Exhibit D

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $223,900.99 | 12-30-2011 | 12-12-2026 | 120800000003 | | | JK | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** JIN HWI LEE
1205 N. MILWAUKEE AVE.
CHICAGO, IL 60642

**Lender:** Bank of Hope - Illinois
CHICAGO LOAN PRODUCTION OFFICE
5901 N. CICERO AVE., SUITE 508
CHICAGO, IL 60646

---

**Principal Amount: $223,900.99**                      **Date of Agreement:  December 12, 2016**

**DESCRIPTION OF EXISTING INDEBTEDNESS.**  A loan evidenced by the Note executed by Borrower in the principal amount of $286,580.00 dated December 30, 2011 ("Note"), together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the Note or Credit Agreement. The current outstanding principal balance is $223,900.99.

**DESCRIPTION OF COLLATERAL.**  A lien on real property evidenced by that certain Real Estate Mortgage dated December 30, 2011 , and recorded on January 13, 2012, in the Official Records of Cook County, State of Illinois, as Instrument No. 1201331093.

**DESCRIPTION OF CHANGE IN TERMS.  1.**  The outstanding balance will be re-amortized over ten (10) years from December 12, 2016, and the maturity date will be changed to **December 12, 2026** (Refer to "PAYMENT" section below).

2.  Interest rate of the Note is changed to **"5.00% (fixed) for first 5 years and then Wall Street Journal Prime Rate (Daily adjustable) + 1.00% for 5 years"** from "6.75% (fixed)" effective as of the date of this agreement.

3.  Prepayment Fee : When, in any one of the first five years from the date of this Change in Terms Agreement, Borrower prepays this Note in full, Borrower must pay to Lender a prepayment fee as follows:

a.  During the first year from the date of this Change in Terms Agreement, 5% of the outstanding principal balance;
b.  During the second year from the date of this Change in Terms Agreement, 4% of the outstanding principal balance;
c.  During the third year from the date of this Change in Terms Agreement, 3% of the outstanding principal balance;
d.  During the fourth year from the date of this Change in Terms Agreement, 2% of the outstanding principal balance;
e.  During the fifth year from the date of this Change in Terms Agreement, 1% of the outstanding principal balance.

Prepayment fee will be waived, if it is sold to third party.

**PAYMENT.**  Borrower will pay this loan in accordance with the following payment schedule, which calculates interest on the unpaid principal balances as described in the "INTEREST CALCULATION METHOD" paragraph using the interest rates described in this paragraph: 60 monthly consecutive principal and interest payments in the initial amount of $2,382.64 each, beginning January 12, 2017, with interest calculated on the unpaid principal balances using an interest rate of 5.000%; 59 monthly consecutive principal and interest payments in the initial amount of $2,353.44 each, beginning January 12, 2022, with interest calculated on the unpaid principal balances using an interest rate based on the Wall Street Journal Prime Rate (currently 3.500%), plus a margin of 1.000 percentage points, resulting in an initial interest rate of 4.500%; and one principal and interest payment of $2,353.14 on December 12, 2026, with interest calculated on the unpaid principal balances using an interest rate based on the Wall Street Journal Prime Rate (currently 3.500%), plus a margin of 1.000 percentage points, resulting in an initial interest rate of 4.500%.  This estimated final payment is based on the assumption that all payments will be made exactly as scheduled and that the Index does not change; the actual final payment will be for all principal and accrued interest not yet paid, together with any other unpaid amounts on this loan.

**VARIABLE INTEREST RATE.**  The interest rate on this loan is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate (the "Index").  The Index is not necessarily the lowest rate charged by Lender on its loans.  If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower.  Lender will tell Borrower the current Index rate upon Borrower's request.  The interest rate change will not occur more often than each day.  Borrower understands that Lender may make loans based on other rates as well.  The interest rate currently is 3.500% per annum.  The interest rate or rates to be applied to the unpaid principal balance during this loan will be the rate or rates set forth herein in the "Payment" section.  Notwithstanding any other provision of this Agreement, after the first payment stream, the interest rate for each subsequent payment stream will be effective as of the due date of the last payment in the just-ending payment stream.  NOTICE:  Under no circumstances will the interest rate on this loan be more than the maximum rate allowed by applicable law.  Whenever increases occur in the interest rate, Lender, at its option, may do one or more of the following:  (A)  increase Borrower's payments to ensure Borrower's loan will pay off by its original final maturity date,  (B)  increase Borrower's payments to cover accruing interest,  (C)  increase the number of Borrower's payments, and  (D)  continue Borrower's payments at the same amount and increase Borrower's final payment.

**INTEREST CALCULATION METHOD.**  Interest on this loan is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.  All interest payable under this loan is computed using this method.  This calculation method results in a higher effective interest rate than the numeric interest rates stated in the loan documents.

**CONTINUING VALIDITY.**  Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect.  Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms.  Nothing in this Agreement will constitute a satisfaction of the obligation(s).  It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing.  Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement.  If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it.  This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**LATE CHARGE .**  If a payment is 11 days or more late, Borrower will be charged **5.000% of the unpaid portion of the regularly scheduled payment.**

**DISHONORED ITEM FEE.**  Borrower will pay a fee to Lender of $30.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**ESCROW ACCOUNT.**  LENDER MAY REQUIRE BORROWER TO PAY AN ADDITIONAL AMOUNT INTO AN ESCROW ACCOUNT FOR PAYMENT OF REAL ESTATE TAXES AND REQUIRED INSURANCE RELATED TO COMMERCIAL REAL ESTATE SECURING THE LOAN.
(Initial _____ ).

Loan No: 120800000003

## CHANGE IN TERMS AGREEMENT
### (Continued)

Page 2

---

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER:

X _____
   JIN HWI LEE

LENDER:

BANK OF HOPE - ILLINOIS

X _____
   Authorized Signer

LaserPro, Ver. 16.2.0.015  Copr. D+H USA Corporation 1997, 2016.  All Rights Reserved.  - IL  C:\CFI\\CAIDFN_PL\D20D.FC  TR-15920  PR-82

# Exhibit E

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $223,900.99 | 12-30-2011 | 12-12-2026 | 120800000003 | | | JK | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** JIN HWI LEE
1205 N. MILWAUKEE AVE.
CHICAGO, IL 60642

**Lender:** Bank of Hope - Illinois
CHICAGO LOAN PRODUCTION OFFICE
5901 N. CICERO AVE., SUITE 508
CHICAGO, IL 60646

---

**THIS BUSINESS LOAN AGREEMENT dated December 12, 2016, is made and executed between JIN HWI LEE ("Borrower") and Bank of Hope - Illinois ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.**

**TERM.** This Agreement shall be effective as of December 12, 2016, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) Security Agreements granting to Lender security interests in the Collateral; (3) financing statements and all other documents perfecting Lender's Security Interests; (4) evidence of insurance as required below; (5) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

**Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Business Activities.** Borrower maintains an office at 1205 N. MILWAUKEE AVE., CHICAGO, IL 60642. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's principal office address or any change in Borrower's name. Borrower shall do all things necessary to comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: **None.**

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents do not conflict with, result in a violation of, or constitute a default under (1) any provision of any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be

**BUSINESS LOAN AGREEMENT**
**(Continued)**

construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

> **Tax Returns.** As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Borrower's Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

> **Additional Requirements.** As soon as available, but in no event later than sixty (60) days after the end of the period, Borrower's Rent Roll and Operating Statements in detailed format acceptable to Lender on an annual basis.

> Borrower shall furnish Lender with personal financial statement in detailed format acceptable to Lender on an annual basis starting dated 10/22/17, not later than sixty (60) days after the end of the period.

> **(Borrower Initials:____/____ ).**

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Financial Covenants and Ratios.** Comply with the following covenants and ratios:

> **Additional Requirements.** Debt Service Coverage Ratio (defined as earnings before interest, taxes, depreciation and amortization (EBITDA) divided by current portion long term debt, current portion of capitalized leases, and interest) of not less than 1.20 to 1.00.

> **(Borrower Initials:____/____ ).**

> Except as provided above, all computations made to determine compliance with the requirements contained in this paragraph shall be made in accordance with generally accepted accounting principles, applied on a consistent basis, and certified by Borrower as being true and correct.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior

**BUSINESS LOAN AGREEMENT**
**(Continued)**

to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Compliance Certificates.** Unless waived in writing by Lender, provide Lender at least annually, with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate and further certifying that, as of the date of the certificate, no Event of Default exists under this Agreement.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**RECOVERY OF ADDITIONAL COSTS.** If the imposition of or any change in any law, rule, regulation, guideline, or generally accepted accounting principle, or the interpretation or application of any thereof by any court, administrative or governmental authority, or standard-setting organization (including any request or policy not having the force of law) shall impose, modify or make applicable any taxes (except federal, state or local income or franchise taxes imposed on Lender), reserve requirements, capital adequacy requirements or other obligations which would (A) increase the cost to Lender for extending or maintaining the credit facilities to which this Agreement relates, (B) reduce the amounts payable to Lender under this Agreement or the Related Documents, or (C) reduce the rate of return on Lender's capital as a consequence of Lender's obligations with respect to the credit facilities to which this Agreement relates, then Borrower agrees to pay Lender such additional amounts as will compensate Lender therefor, within five (5) days after Lender's written demand for such payment, which demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by Borrower, which explanation and calculations shall be conclusive in the absence of manifest error.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, or (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change ownership, dissolve or transfer or sell Collateral out of the ordinary course of business.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.** Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Environmental Default.** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with any Loan.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The death of Borrower or the dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after Lender sends written notice to Borrower or Grantor, as the case may be, demanding cure of such default: (1) cure the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**BUSINESS LOAN AGREEMENT**
**(Continued)**

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Illinois without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Illinois.

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of COOK County, State of Illinois.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in making the Loan, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the making of the Loan and delivery to Lender of the Related Documents, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means JIN HWI LEE and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust,

**BUSINESS LOAN AGREEMENT**
(Continued)

factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note and all future advances made pursuant to the Note or any renewal, extension or modification thereof, including all principal and interest, together with all other indebtedness and cost and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means Bank of Hope - Illinois, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note executed by JIN HWI LEE in the principal amount of $286,580.00 dated December 30, 2011, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED DECEMBER 12, 2016.

BORROWER:

X _____
JIN HWI LEE

# BUSINESS LOAN AGREEMENT
## (Continued)

Loan No: 120800000003

Page 7

LENDER:

BANK OF HOPE - ILLINOIS

By: _____
    Authorized Signer

LaserPro, Ver. 16.3.0.016 Copr. D+H USA Corporation 1997, 2016. All Rights Reserved. - IL C:\CFI\WCACCFI\LPL\C40.FC TR-19323 PR-52

# Exhibit F

‖*1700410046*‖

Doc# 1700410046 Fee $44.00

RHSP FEE:$9.00 RPRF FEE: $1.00
KAREN A.YARBROUGH
COOK COUNTY RECORDER OF DEEDS
DATE: 01/04/2017 11:53 AM PG: 1 OF 4

WHEN RECORDED MAIL TO:
Bank of Hope (Attn: Loan
Servicing Dept.)
3731 WILSHIRE BLVD., STE.
420
LOS ANGELES, CA 90010

SEND TAX NOTICES TO:
JIN HWI LEE
1205 N. MILWAUKEE AVE.
CHICAGO, IL 60642

**FOR RECORDER'S USE ONLY**

This Modification of Mortgage prepared by:
Loan Operations Dept.
Bank of Hope - Illinois
5901 N. CICERO AVE., SUITE 508
CHICAGO, IL 60646

# MODIFICATION OF MORTGAGE

**THIS MODIFICATION OF MORTGAGE** dated December 12, 2016, is made and executed between JIN HWI LEE, whose address is 1205 N. MILWAUKEE AVENUE, CHICAGO, IL 60642 (referred to below as "Grantor") and Bank of Hope - Illinois, whose address is 5901 N. CICERO AVE., SUITE 508, CHICAGO, IL 60646 (referred to below as "Lender").

**MORTGAGE.** Lender and Grantor have entered into a Mortgage dated December 30, 2011 (the "Mortgage") which has been recorded in COOK County, State of Illinois, as follows:

as Instrument No. 1201331093 recorded on January 13, 2012.

**REAL PROPERTY DESCRIPTION.** The Mortgage covers the following described real property located in COOK County, State of Illinois:

See EXHIBIT "A", which is attached to this Modification and made a part of this Modification as if fully set forth herein.

The Real Property or its address is commonly known as 1205 N. MILWAUKEE AVENUE, CHICAGO, IL 60642. The Real Property tax identification number is 17-05-115-085-0000.

**MODIFICATION.** Lender and Grantor hereby modify the Mortgage as follows:

For good and valuable consideration, Grantor declares that said Mortgagee shall continue to be security for the payment of the indebtedness of JIN HWI LEE to Lender (Bank of Hope formerly known as Foster Bank) evidenced by a Note dated December 30, 2011, in the original principal amount of $286,580.00("Note").

The Note has been modified by a Change In Terms Agreement dated December 12, 2016, to extend the maturity date, and to change the interest rate.

**CONTINUING VALIDITY.** Except as expressly modified above, the terms of the original Mortgage shall remain



## MODIFICATION OF MORTGAGE
### (Continued)

Loan No: 120800000003

Page 2

unchanged and in full force and effect and are legally valid, binding, and enforceable in accordance with their respective terms. Consent by Lender to this Modification does not waive Lender's right to require strict performance of the Mortgage as changed above nor obligate Lender to make any future modifications. Nothing in this Modification shall constitute a satisfaction of the promissory note or other credit agreement secured by the Mortgage (the "Note"). It is the intention of Lender to retain as liable all parties to the Mortgage and all parties, makers and endorsers to the Note, including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, shall not be released by virtue of this Modification. If any person who signed the original Mortgage does not sign this Modification, then all persons signing below acknowledge that this Modification is given conditionally, based on the representation to Lender that the non-signing person consents to the changes and provisions of this Modification or otherwise will not be released by it. This waiver applies not only to any initial extension or modification, but also to all such subsequent actions.

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MODIFICATION OF MORTGAGE AND GRANTOR AGREES TO ITS TERMS. THIS MODIFICATION OF MORTGAGE IS DATED DECEMBER 12, 2016.

GRANTOR:

X _____
JIN HWI LEE

LENDER:

BANK OF HOPE - ILLINOIS

X _____
Authorized Signer

## MODIFICATION OF MORTGAGE
### (Continued)

Loan No: 120800000003

Page 3

## INDIVIDUAL ACKNOWLEDGMENT

STATE OF ___ILLINOIS___ )
) SS
COUNTY OF ___COOK___ )

On this day before me, the undersigned Notary Public, personally appeared **JIN HWI LEE**, to me known to be the individual described in and who executed the Modification of Mortgage, and acknowledged that he or she signed the Modification as his or her free and voluntary act and deed, for the uses and purposes therein mentioned.

Given under my hand and official seal this ___23rd___ day of ___December___, 20 16 .

By ___RACHEL S. LIEU___    Residing at ___MT. PROSPECT, IL___

Notary Public in and for the State of ___Illinois___

My commission expires ___04/23/2017___

> *"OFFICIAL SEAL"*
> RACHEL S. LIEU
> NOTARY PUBLIC, STATE OF ILLINOIS
> My Commission Expires 04/23/2017

## LENDER ACKNOWLEDGMENT

STATE OF ___Illinois___ )
) SS
COUNTY OF ___Cook___ )

On this ___23rd___ day of ___Dec___, ___2016___ before me, the undersigned Notary Public, personally appeared ___Joy Kong___ and known to me to be the ___VP & Loan officer___, authorized agent for Bank of Hope - Illinois that executed the within and foregoing instrument and acknowledged said instrument to be the free and voluntary act and deed of **Bank of Hope - Illinois**, duly authorized by **Bank of Hope - Illinois** through its board of directors or otherwise, for the uses and purposes therein mentioned, and on oath stated that he or she is authorized to execute this said instrument and in fact executed this said instrument on behalf of Bank of Hope - Illinois.

By _____    Residing at ___Palatine, IL___

Notary Public in and for the State of ___Illinois___

My commission expires ___8/24/2017___

> OFFICIAL SEAL
> HANNAH JUN
> Notary Public - State of Illinois
> My Commission Expires Aug 24, 2017

## MODIFICATION OF MORTGAGE
### (Continued)

Loan No: 120800000003

Page 4

LaserPro, Ver. 16.2.0.015   Copr. D+H USA Corporation 1997, 2016.   All Rights Reserved.   - IL
C:\CFIWCA\CFI\LPL\G201.FC  TR-19329  PR-82

"EXHIBIT A"

LOT 71 SUBDIVISIION OF BLOCK 12 IN CANAL TRUSTEE'S SUBDIVISION OF THE WEST PART OF SECTION 5, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN (EXCEPT THE SOUTH EAST 1/4 OF THE NORTHWEST 1/4 AND THE NORTHEAST 1/4 OF THE SOUTHWEST 1/4) IN COOK COUNTY, ILLINOIS.

Commonly Known As : 1205 N Milwaukee Ave, Chicago, IL60622

Permanent Index Number(s): 17-05-115-085-0000

# Exhibit G

*1700410047*

Doc# 1700410047 Fee $52.00

RHSP FEE:$9.00 RPRF FEE: $1.00

KAREN A.YARBROUGH

COOK COUNTY RECORDER OF DEEDS

DATE: 01/04/2017 11:54 AM PG: 1 OF 8

WHEN RECORDED MAIL TO:
Bank of Hope (Attn: Loan
Servicing Dept.)
3731 WILSHIRE BLVD., STE.
420
LOS ANGELES, CA 90010

SEND TAX NOTICES TO:
JIN HWI LEE
1205 N. MILWAUKEE AVE.
CHICAGO, IL 60642

FOR RECORDER'S USE ONLY

This ASSIGNMENT OF RENTS prepared by:
Loan Operations Dept.
Bank of Hope - Illinois
5901 N. CICERO AVE., SUITE 508
CHICAGO, IL 60646

# ASSIGNMENT OF RENTS

THIS ASSIGNMENT OF RENTS dated December 12, 2016, is made and executed between JIN HWI LEE, whose address is **1205 N. MILWAUKEE AVENUE, CHICAGO, IL 60642** (referred to below as "Grantor") and Bank of Hope - Illinois, whose address is **5901 N. CICERO AVE., SUITE 508, CHICAGO, IL 60646** (referred to below as "Lender").

**ASSIGNMENT.** For valuable consideration, Grantor hereby assigns, grants a continuing security interest in, and conveys to Lender all of Grantor's right, title, and interest in and to the Rents from the following described Property located in COOK County, State of Illinois:

See EXHIBIT "A", which is attached to this Assignment and made a part of this Assignment as if fully set forth herein.

The Property or its address is commonly known as **1205 N. MILWAUKEE AVENUE, CHICAGO, IL 60642.** The Property tax identification number is **17-05-115-085-0000.**

**THIS ASSIGNMENT IS GIVEN TO SECURE (1) PAYMENT OF THE INDEBTEDNESS AND (2) PERFORMANCE OF ANY AND ALL OBLIGATIONS OF GRANTOR UNDER THE NOTE, THIS ASSIGNMENT, AND THE RELATED DOCUMENTS. THIS ASSIGNMENT IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:**

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Assignment or any Related Documents, Grantor shall pay to Lender all amounts secured by this Assignment as they become due, and shall strictly perform all of Grantor's obligations under this Assignment. Unless and until Lender exercises its right to collect the Rents as provided below and so long as there is no default under this Assignment, Grantor may remain in possession and control of and operate and manage the Property and collect the Rents, provided that the granting of the right to collect the Rents shall not constitute Lender's consent to the use of cash collateral in a



bankruptcy proceeding.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES.** Grantor warrants that:

**Ownership.** Grantor is entitled to receive the Rents free and clear of all rights, loans, liens, encumbrances, and claims except as disclosed to and accepted by Lender in writing.

**Right to Assign.** Grantor has the full right, power and authority to enter into this Assignment and to assign and convey the Rents to Lender.

**No Prior Assignment.** Grantor has not previously assigned or conveyed the Rents to any other person by any instrument now in force.

**No Further Transfer.** Grantor will not sell, assign, encumber, or otherwise dispose of any of Grantor's rights in the Rents except as provided in this Assignment.

**LENDER'S RIGHT TO RECEIVE AND COLLECT RENTS.** Lender shall have the right at any time, and even though no default shall have occurred under this Assignment, to collect and receive the Rents. For this purpose, Lender is hereby given and granted the following rights, powers and authority:

**Notice to Tenants.** Lender may send notices to any and all tenants of the Property advising them of this Assignment and directing all Rents to be paid directly to Lender or Lender's agent.

**Enter the Property.** Lender may enter upon and take possession of the Property; demand, collect and receive from the tenants or from any other persons liable therefor, all of the Rents; institute and carry on all legal proceedings necessary for the protection of the Property, including such proceedings as may be necessary to recover possession of the Property; collect the Rents and remove any tenant or tenants or other persons from the Property.

**Maintain the Property.** Lender may enter upon the Property to maintain the Property and keep the same in repair; to pay the costs thereof and of all services of all employees, including their equipment, and of all continuing costs and expenses of maintaining the Property in proper repair and condition, and also to pay all taxes, assessments and water utilities, and the premiums on fire and other insurance effected by Lender on the Property.

**Compliance with Laws.** Lender may do any and all things to execute and comply with the laws of the State of Illinois and also all other laws, rules, orders, ordinances and requirements of all other governmental agencies affecting the Property.

**Lease the Property.** Lender may rent or lease the whole or any part of the Property for such term or terms and on such conditions as Lender may deem appropriate.

**Employ Agents.** Lender may engage such agent or agents as Lender may deem appropriate, either in Lender's name or in Grantor's name, to rent and manage the Property, including the collection and application of Rents.

**Other Acts.** Lender may do all such other things and acts with respect to the Property as Lender may deem appropriate and may act exclusively and solely in the place and stead of Grantor and to have all of the powers of Grantor for the purposes stated above.

**No Requirement to Act.** Lender shall not be required to do any of the foregoing acts or things, and the fact that Lender shall have performed one or more of the foregoing acts or things shall not require Lender to do any other specific act or thing.

**APPLICATION OF RENTS.** All costs and expenses incurred by Lender in connection with the Property shall be for Grantor's account and Lender may pay such costs and expenses from the Rents. Lender, in its sole discretion, shall determine the application of any and all Rents received by it; however, any such Rents received by Lender which are not applied to such costs and expenses shall be applied to the Indebtedness. All expenditures made by Lender under this Assignment and not reimbursed from the Rents shall become a part of the Indebtedness secured by this Assignment, and shall be payable on demand, with interest at the Note rate

from date of expenditure until paid.

**FULL PERFORMANCE.** If Grantor pays all of the indebtedness when due and otherwise performs all the obligations imposed upon Grantor under this Assignment, the Note, and the Related Documents, Lender shall execute and deliver to Grantor a suitable satisfaction of this Assignment and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Property. Any termination fee required by law shall be paid by Grantor, if permitted by applicable law.

**REINSTATEMENT OF SECURITY INTEREST.** If payment is made by Grantor, whether voluntarily or otherwise, or by guarantor or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment (A) to Grantor's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, (B) by reason of any judgment, decree or order of any court or administrative body having jurisdiction over Lender or any of Lender's property, or (C) by reason of any settlement or compromise of any claim made by Lender with any claimant (including without limitation Grantor), the Indebtedness shall be considered unpaid for the purpose of enforcement of this Assignment and this Assignment shall continue to be effective or shall be reinstated, as the case may be, notwithstanding any cancellation of this Assignment or of any note or other instrument or agreement evidencing the Indebtedness and the Property will continue to secure the amount repaid or recovered to the same extent as if that amount never had been originally received by Lender, and Grantor shall be bound by any judgment, decree, order, settlement or compromise relating to the Indebtedness or to this Assignment.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Grantor fails to comply with any provision of this Assignment or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Assignment or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Rents or the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Assignment also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Assignment:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Assignment or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default on Other Payments.** Failure of Grantor within the time required by this Assignment to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**Default in Favor of Third Parties.** Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Grantor's property or ability to perform Grantor's obligations under this Assignment or any of the Related Documents.

**Environmental Default.** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with the Property.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Assignment or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Assignment or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The death of Grantor, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against the Rents or any property securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Property Damage or Loss.** The Property is lost, stolen, substantially damaged, sold, or borrowed against.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the Indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Grantor has not been given a notice of a breach of the same provision of this Assignment within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Grantor demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of any Event of Default and at any time thereafter, Lender may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** Lender shall have the right at its option without notice to Grantor to declare the entire Indebtedness immediately due and payable, including any prepayment penalty that Grantor would be required to pay.

**Collect Rents.** Lender shall have the right, without notice to Grantor, to take possession of the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender shall have all the rights provided for in the Lender's Right to Receive and Collect Rents Section, above. If the Rents are collected by Lender, then Grantor irrevocably designates Lender as Grantor's attorney-in-fact to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may

Loan No: 120800000003

exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Mortgagee in Possession.** Lender shall have the right to be placed as mortgagee in possession or to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The mortgagee in possession or receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Assignment or the Note or by law.

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Assignment, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Assignment, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees, title insurance, and fees for the Trustee, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Assignment:

**Amendments.** This Assignment, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Assignment. No alteration of or amendment to this Assignment shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Caption Headings.** Caption headings in this Assignment are for convenience purposes only and are not to be used to interpret or define the provisions of this Assignment.

**Governing Law. This Assignment will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Illinois without regard to its conflicts of law provisions. This Assignment has been accepted by Lender in the State of Illinois.**

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of COOK County, State of Illinois.

**Merger.** There shall be no merger of the interest or estate created by this assignment with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Interpretation.** (1) In all cases where there is more than one Borrower or Grantor, then all words used in this Assignment in the singular shall be deemed to have been used in the plural where the context and construction so require. (2) If more than one person signs this Assignment as "Grantor," the obligations of each Grantor are joint and several. This means that if Lender brings a lawsuit, Lender may sue any one

or more of the Grantors. If Borrower and Grantor are not the same person, Lender need not sue Borrower first, and that Borrower need not be joined in any lawsuit. (3) The names given to paragraphs or sections in this Assignment are for convenience purposes only. They are not to be used to interpret or define the provisions of this Assignment.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Assignment unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Assignment shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Assignment. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Assignment, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Assignment shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Assignment. Any party may change its address for notices under this Assignment by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Powers of Attorney.** The various agencies and powers of attorney conveyed on Lender under this Assignment are granted for purposes of security and may not be revoked by Grantor until such time as the same are renounced by Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Assignment to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Assignment. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Assignment shall not affect the legality, validity or enforceability of any other provision of this Assignment.

**Successors and Assigns.** Subject to any limitations stated in this Assignment on transfer of Grantor's interest, this Assignment shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Assignment and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Assignment or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Assignment.

**Waiver of Homestead Exemption.** Grantor hereby releases and waives all rights and benefits of the homestead exemption laws of the State of Illinois as to all Indebtedness secured by this Assignment.

**Waiver of Right of Redemption.** NOTWITHSTANDING ANY OF THE PROVISIONS TO THE CONTRARY CONTAINED IN THIS ASSIGNMENT, GRANTOR HEREBY WAIVES ANY AND ALL RIGHTS OF REDEMPTION FROM SALE UNDER ANY ORDER OR JUDGMENT OF FORECLOSURE ON GRANTOR'S BEHALF AND ON BEHALF OF EACH AND EVERY PERSON, EXCEPT JUDGMENT CREDITORS OF GRANTOR, ACQUIRING ANY INTEREST IN OR TITLE TO THE PROPERTY SUBSEQUENT TO THE DATE OF THIS ASSIGNMENT.

## ASSIGNMENT OF RENTS
(Continued)

Loan No: 120800000003

Page 7

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Assignment. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Assignment shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Assignment.** The word "Assignment" means this ASSIGNMENT OF RENTS, as this ASSIGNMENT OF RENTS may be amended or modified from time to time, together with all exhibits and schedules attached to this ASSIGNMENT OF RENTS from time to time.

**Borrower.** The word "Borrower" means JIN HWI LEE.

**Default.** The word "Default" means the Default set forth in this Assignment in the section titled "Default".

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Assignment in the default section of this Assignment.

**Grantor.** The word "Grantor" means JIN HWI LEE.

**Guaranty.** The word "Guaranty" means the guaranty from guarantor, endorser, surety, or accommodation party to Lender, including without limitation a guaranty of all or part of the Note.

**Indebtedness.** The word "Indebtedness" means the Indebtedness evidenced by the Note and all future advances made pursuant to the Note or any renewal, extension or modification thereof, including all principal and interest, together with all other indebtedness and cost and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means Bank of Hope - Illinois, its successors and assigns.

**Note.** The word "Note" means the Note executed by JIN HWI LEE in the principal amount of $286,580.00 dated December 30, 2011, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Assignment" section of this Assignment.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all of Grantor's present and future rights, title and interest in, to and under any and all present and future leases, including, without limitation, all rents, revenue, income, issues, royalties, bonuses, accounts receivable, cash or security deposits, advance rentals, profits and proceeds from the Property, and other payments and benefits derived or to be derived from such leases of every kind and nature, whether due now or later, including without limitation Grantor's right to enforce such leases and to receive and collect payment and proceeds thereunder.

**THE UNDERSIGNED ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS ASSIGNMENT. THIS DOCUMENT IS EXECUTED ON DECEMBER 12, 2016.**

GRANTOR:

X _____

JIN HWI LEE

**Loan No: 120800000003**

## ASSIGNMENT OF RENTS
(Continued)

Page 8

---

## INDIVIDUAL ACKNOWLEDGMENT

STATE OF ___ILLINOIS___ )
) SS
COUNTY OF ___COOK___ )

On this day before me, the undersigned Notary Public, personally appeared **JIN HWI LEE**, to me known to be the individual described in and who executed the ASSIGNMENT OF RENTS, and acknowledged that he or she signed the Assignment as his or her free and voluntary act and deed, for the uses and purposes therein mentioned.

Given under my hand and official seal this ___23rd___ day of ___December___, 20_16_.

By ___RACHEL S. LIEU___ Residing at ___Mt. prospect, IL___

Notary Public in and for the State of ___Illinois___

My commission expires ___04/23/2017___

*"OFFICIAL SEAL"*
RACHEL S. LIEU
NOTARY PUBLIC, STATE OF ILLINOIS
My Commission Expires 04/23/2017

---

LaserPro, Ver. 16.2.0.015   Copr. D+H USA Corporation 1997, 2016.   All Rights Reserved.   - IL
C:\CFIWCA\CFI\LPL\G14.FC  TR-19329  PR-82

## "EXHIBIT A"

LOT 71 SUBDIVISIION OF BLOCK 12 IN CANAL TRUSTEE'S SUBDIVISION OF THE WEST PART OF SECTION 5, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN (EXCEPT THE SOUTH EAST 1/4 OF THE NORTHWEST 1/4 AND THE NORTHEAST 1/4 OF THE SOUTHWEST 1/4) IN COOK COUNTY, ILLINOIS.

Commonly Known As :  1205 N Milwaukee Ave, Chicago, IL 60622

Permanent Index Number(s):  17-05-115-085-0000

# <u>Exhibit H</u>



Doc# 2300422002 Fee $88.00

RHSP FEE:$9.00 RPRF FEE: $1.00
KAREN A. YARBROUGH
COOK COUNTY CLERK
DATE: 01/04/2023 09:13 AM  PG:  1 OF 4

THIS INSTRUMENT WAS DRAFTED BY:
Bank of Hope
3731 Wilshire Blvd., Suite 420
Los Angeles, CA 90010

WHEN RECORDED MAIL TO:
APSEC Resolution Trust, LLC
700 South Flower Street, Suite 850
Los Angeles, CA 90017

PARCEL ID: 17-05-115-085-0000

H01-0088605 082LFE , 1 of 2 , MM

**Chicago Title**

*(Space above this line for Recorder's use)*

## ASSIGNMENT OF MORTGAGE

This Assignment of Mortgage is made by Bank of Hope, a California state-chartered bank (f/k/a Foster Bank) ("**Assignor**"), whose mailing address is 3200 Wilshire Blvd., Suite 1400, Los Angeles, CA 90010, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, in favor of APSEC Resolution Trust, LLC, a Delaware limited liability company ("**Assignee**"), whose address is 700 South Flower Street, Suite 850, Los Angeles, CA 90017.

Assignor hereby assigns, transfers and sets over to Assignee, its successors and assigns, "AS IS", "WHERE IS", "WITH ALL FAULTS" AND WITHOUT RECOURSE AND WITHOUT ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, EXCEPT AS PROVIDED IN THAT CERTAIN LOAN PURCHASE AND SALE AGREEMENT DATED December 14, 2022, BETWEEN ASSIGNOR AND ASSIGNEE, all of Assignor's right, title and interest, as beneficiary, in and to that certain Real Estate Mortgage, dated December 30, 2011, given by Jin Hwi Lee, for the benefit of Assignor, recorded on January 13, 2012 as Document Number 1201331093 in the Office of the Recorder in Cook County, Illinois, as modified by that certain Modification of Mortgage, dated December 12, 2016, between Jin Hwi Lee and Assignor, recorded on January 4, 2017 as Document Number 1700410046 the Office of the Recorder in Cook County, Illinois, describing land therein as:

See **Exhibit "A"** which is attached hereto and incorporated herein by this reference;

TOGETHER with all interest secured thereby, the note or notes therein described or referred to, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Real Estate Mortgage, as the same may have been assigned, amended, supplemented, restated or modified.

**TO HAVE AND TO HOLD** the same unto Assignee and its successors and assigns forever.

Executed this 29th day of December, 2022.

Bank of Hope,
a California state-chartered bank

By: _____

Name: Stephan Lee
Title: SVP & SAD Deputy Manager

## ACKNOWLEDGMENT

> *A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.*

STATE OF CALIFORNIA          )
COUNTY OF  Los Angeles        )

On  Dec 29, 2022 , before me,  Un Shil Kang , Notary Public,

personally appeared  Stephan Lee _____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of State of California that the foregoing paragraph is true and correct.

UN SHIL KANG
Notary Public · California
Los Angeles County
Commission # 2302337
My Comm. Expires Sep 17, 2023

WITNESS my hand and official seal.

SIGNATURE _____

PLACE NOTARY SEAL ABOVE

REGISTRATION NO: _____

Bank of Hope,
a California state-chartered bank

By: _____

Name: Andrew Park

Title: SVP & SAD Manager


## ACKNOWLEDGMENT

> *A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.*

STATE OF CALIFORNIA )
COUNTY OF  Los Angeles   )

On  Dec 29, 2022 , before me, ___Un Shil Kang___ , Notary Public,

personally appeared ___Andrew Park___

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of State of California that the foregoing paragraph is true and correct.

UN SHIL KANG
Notary Public - California
Los Angeles County
Commission # 2302337
My Comm. Expires Sep 17, 2023

PLACE NOTARY SEAL ABOVE

WITNESS my hand and official seal.

SIGNATURE_____U.S.Ω_____

REGISTRATION NO: _____

# Exhibit "A"

LOT 71 SUBDIVISION OF BLOCK 12 IN CANAL TRUSTEE'S SUBDIVISION OF THE WEST PART OF SECTION 5, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN (EXCEPT THE SOUTH EAST 1/4 OF THE NORTHWEST 1/4 AND THE NORTHEAST 1/4 OF THE SOUTHWEST 1/4) IN COOK COUNTY, ILLINOIS.

Commonly Known As : 1205 N Milwaukee Ave, Chicago, IL 60622

Permanent Index Number(s): 17-05-115-085-0000

# Exhibit I

**Chicago Title**

THIS INSTRUMENT WAS DRAFTED BY:
Bank of Hope
3731 Wilshire Blvd., Suite 420
Los Angeles, CA 90010

*2300422003*

Doc# 2300422003 Fee $88.00

RHSP FEE:$9.00 RPRF FEE: $1.00
KAREN A. YARBROUGH
COOK COUNTY CLERK
DATE: 01/04/2023 09:13 AM PG: 1 OF 4

WHEN RECORDED MAIL TO:
APSEC Resolution Trust, LLC
700 South Flower Street, Suite 850
Los Angeles, CA 90017

PARCEL ID:  17-05-115-085-0000

1401-0088050832LFE, 2 of 2, MM

*(Space above this line for Recorder's use)*

## ASSIGNMENT OF ASSIGNMENT OF RENTS

This Assignment of Assignment of Rents is made by Bank of Hope, a California state-chartered bank ("**Assignor**"), whose mailing address is 3200 Wilshire Blvd., Suite 1400, Los Angeles, CA 90010, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, in favor of APSEC Resolution Trust, LLC, a Delaware limited liability company ("**Assignee**"), whose address is 700 South Flower Street, Suite 850, Los Angeles, CA 90017.

Assignor hereby assigns, transfers and sets over to Assignee, its successors and assigns, "AS IS", "WHERE IS", "WITH ALL FAULTS" AND WITHOUT RECOURSE AND WITHOUT ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, EXCEPT AS PROVIDED IN THAT CERTAIN LOAN PURCHASE AND SALE AGREEMENT DATED December 14, 2022, BETWEEN ASSIGNOR AND ASSIGNEE, all of Assignor's right, title and interest, as beneficiary, in and to that certain Assignment of Rents, dated December 12, 2016, given by Jin Hwi Lee, for the benefit of Assignor, recorded on January 4, 2017 as Document Number 1700410047 in the Office of the Recorder in Cook County, Illinois, describing land therein as:

See **Exhibit "A"** which is attached hereto and incorporated herein by this reference;

TOGETHER with all interest secured thereby, the note or notes therein described or referred to, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Assignment of Rents, as the same may have been assigned, amended, supplemented, restated or modified.

**TO HAVE AND TO HOLD** the same unto Assignee and its successors and assigns forever.

Executed this 29th day of December, 2022.

Bank of Hope,
a California state-chartered bank

By: _____
Name: Stephan Lee
Title:  SVP & SAD Deputy Manager

## ACKNOWLEDGMENT

*A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.*

STATE OF CALIFORNIA       )
COUNTY OF __Los Angeles__    )

On __Dec 29, 2022__, before me, __Un Shil Kang__, Notary Public, personally appeared ____Stephan Lee_____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

UN SHIL KANG
Notary Public - California
Los Angeles County
Commission # 2302337
My Comm. Expires Sep 17, 2023

PLACE NOTARY SEAL ABOVE

SIGNATURE_____
REGISTRATION NO: _____

Bank of Hope,
a California state-chartered bank

By: _____

Name: Andrew Park

Title:   SVP & SAD Manager


## ACKNOWLEDGMENT

---

*A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed
the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.*

---

STATE OF CALIFORNIA          )
COUNTY OF _Los Angeles_      )

On _Dec 29, 2022_ , before me, _Un Shil Kang_ , Notary Public,

personally appeared _____ Andrew Park _____ _____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same
in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument
the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of State of California that the foregoing
paragraph is true and correct.

UN SHIL KANG
Notary Public · California
Los Angeles County
Commission # 2302337
My Comm. Expires Sep 17, 2023

WITNESS my hand and official seal.

SIGNATURE_____ _U S. Ka_____

REGISTRATION NO: _____

PLACE NOTARY SEAL ABOVE

2300422003 Page: 4 of 4

## Exhibit "A"

LOT 71 SUBDIVISION OF BLOCK 12 IN CANAL TRUSTEE'S SUBDIVISION OF THE WEST PART OF SECTION 5, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN (EXCEPT THE SOUTH EAST 1/4 OF THE NORTHWEST 1/4 AND THE NORTHEAST 1/4 OF THE SOUTHWEST 1/4) IN COOK COUNTY, ILLINOIS.

Commonly Known As : 1205 N Milwaukee Ave, Chicago, IL 60622

Permanent Index Number(s): 17-05-115-085-0000